## IN THE MATTER OF DANTE DePAMPHILIS, ATTORNEY-AT-LAW OF THE STATE OF NEW JERSEY.

## IN THE MATTER OF LAWRENCE FRIEDMAN, ATTORNEY-AT-LAW OF THE STATE OF NEW JERSEY.

Argued April 20, 1959—Decided July 31, 1959.

*Mr. Abram A. Lebson* argued the causes for the Bergen County Ethics and Grievance Committee.

*Mr. Albert S. Gross* argued the cause for respondent DePamphilis (*Messrs. Gross and Gross,* attorneys; *Mr. Albert S. Gross,* of counsel).

*Mr. Walter D. Van Riper* argued the cause for respondent Friedman (*Messrs. Van Riper and Belmont,* attorneys; *Mr. Van Riper,* of counsel).

The opinion of the court was delivered by

HALL, J. The Bergen County Ethics and Grievance Committee filed separate presentments charging each respondent with unethical and unprofessional conduct "in recommending the transfer of properties in an attempt to defraud creditors and to file bankruptcy proceedings and in his participation in the actual transfer of properties * * *." The ethical problem involved has not previously been the subject of consideration by this court.

The matter originated from a self-prepared written complaint against both attorneys made by their clients, Mr. and Mrs. James Zuccarelli, and filed with the committee early in March 1957. At that time the Zuccarellis were engaged in a controversy with respondent DePamphilis, whom they had retained several months previously in connection with financial difficulties in the operation of their retail confectionery business and who had early brought respondent Friedman into the matter, concerning the amount of the fee to be paid for the services actually rendered. The burden of the rather vitriolic complaint was that the fee agreed upon at the inception with both attorneys, a small part of which was paid in cash and the balance represented by a series of monthly notes then given which had been discounted by DePamphilis at a bank, was excessive because all of the legal work contemplated when the amount was fixed was not performed by reason of a change in the course of events. It was further claimed in effect that considerable of the advice given amounted to misguidance and the services actually rendered were in large part unnecessary. The document

asserted that a reduction in the original amount had been agreed to, but that DePamphilis had subsequently changed his mind, refused to return the remainder of the notes and threatened suit when the one currently due was not met. The document said: "We would like a refund on the counsel fees paid and a return of the signed notes to us."

In detailing in the complaint the chronology of happenings to support their charges, the Zuccarellis mentioned that DePamphilis originally advised them that, since they owned real estate, "we should turn our property over to someone and later on go bankrupt," and that subsequently the real estate was transferred to Zuccarelli's uncle, Edward Curran, at Friedman's office. They contended, not that such was unethical conduct on the part of the attorneys, but rather that it was bad legal advice because, as they claimed: "We could not go bankrupt" and "Transfer of property must set for 2 years before filing bankruptcy."

Only DePamphilis was called upon to answer the complaint, since Friedman practiced in another county and the committee had no express jurisdiction over him. *R. R.* 1:16–2(*a*). The answer, beside asserting the necessity and soundness of the services and that the agreed fee was not excessive, denied any original advice to turn over the real estate to anyone and then to file a petition in bankruptcy. It did say, however, that the transfer came about when shortly thereafter the Zuccarellis appeared at a conference in Friedman's office with the uncle and suggested they would like to convey their real estate to him because they owed him money for loans, said to have been evidenced by withdrawals shown in the uncle's savings account pass book over a period of 17 years, approximately equal to the equity in the properties. Following preliminary investigation, in which the whole matter was explored with the complainants and the attorney, the committee determined that a hearing be held and all witnesses examined including Friedman. At the several sessions which followed, it most properly and in conscientious performance of its plain duty

went thoroughly into and considered not only the matter of the fee, but also the question of any unprofessional conduct relating to the services performed, especially the conveyance of the real estate. Friedman appeared at the hearings as associate counsel for DePamphilis, was called as a witness in his behalf and examined and cross-examined by the members of the committee and the designated prosecutor as thoroughly as if the charges against him were then being heard and considered.

The unanimous presentment against DePamphilis was dated October 4, 1957, charging him as to the property transfers as previously set forth, but finding that there was insufficient evidence of unethical or unprofessional conduct in connection with the complaint as to counsel fees. We are not therefore further concerned with that phase.

After the Bergen County presentment was filed, that committee referred the complaint as against Friedman for action in Essex County where he practiced. In due time he filed an answer and, at the request of that committee, a supplement thereto, the latter dated January 7, 1958. With respect to the question now before us, Friedman stated he advised the Zuccarellis bankruptcy would not lie because they were solvent and the real estate transfers were made at their request under circumstances similar to those related by DePamphilis. Friedman stressed, in his pleading, as had DePamphilis, that the complaint was motivated by a desire to avoid payment of agreed legal fees. We must comment that such a purpose in no way excuses unprofessional conduct disclosed on consideration of the complaint and appropriate disciplinary action if clear and convincing evidence establishes violation of the pertinent rules of conduct.

The Essex County Committee, after reviewing the Friedman case, quite correctly decided that it would be necessary to re-examine the witnesses who had testified in Bergen County and so sought the instructions of this court. To avoid duplication of effort, we directed the complaint as to

Friedman to be returned to that county for determination and withheld action meanwhile on the DePamphilis presentment. Because of the press of other matters the Bergen County Committee could not reach it for attention until September 1958. At the scheduled hearing Friedman by his counsel stipulated, in view of the full testimony already taken, in which he had participated, that the complaint be considered and determined on the record of that evidence. He knew that in the interim several new members who had not heard the witnesses had been appointed to the committee. Of the six members who considered the Friedman case, only three had been among the five participating in the presentment against DePamphilis. On December 22, 1958 the committee returned a presentment against Friedman, almost identical with that filed in the DePamphilis matter as to the property transaction, but naturally making no mention of the fee matter already determined. One of the six members dissented; he had sat in the former case.

Consideration of the presentment must be had in the light of the pertinent evidence in order to determine respondents' contention that the findings are not supported by adequate clear and convincing evidence. In October 1956 the Zuccarellis operated a confectionery store business in Newark which they had purchased in July 1955. The price had been paid partly in cash and the remainder by a purchase money chattel mortgage on the stock and fixtures held by the sellers. The payments on the debt secured thereby were $150 a month, plus interest. The instrument contained a provision making any balance due upon a sale of the business by the Zuccarellis. They also had assumed the balance of an obligation for the soda fountain on which $79 had to be paid each month. Sometime subsequently they had received a $2,000 loan from an ice cream company on which the required monthly payment was also about $79. Rent was $125 per month. While there had been no written contract of purchase the closing statement showed the gross receipts for the trial period prior to the transfer of the

business had met the sellers' guarantee of $850 per week. After the purchase the receipts steadily declined until by winter the gross was $600 or less a week and the venture was becoming unprofitable. In the early months of 1956 Mrs. Zuccarelli visited the attorney who had represented them in the purchase, probably on several occasions, complaining about the state of the business and wanting to know how they could get out of it. Obviously an emotional and excitable person, she expressed worry about the chattel mortgage and the attorney informed her personal liability on the obligation would remain even if the mortgage was foreclosed. On one visit she mentioned bankruptcy as a possible avenue of escape, an indication she was not entirely unfamiliar with procedures that might be resorted to by hard-pressed debtors. She was dissatisfied with suggestions made by this attorney, but did nothing further for a time and the store continued to lose financial ground. By October of that year the situation had apparently become precarious and the chattel mortgages payments were in default or about to become so.

Shortly before the middle of that month she and her husband consulted DePamphilis at his office in Lyndhurst. He had represented each of them in other matters some years before. They laid their situation before him and asked how it could be relieved. At that time they claimed in effect that the sellers' guarantee of the gross receipts of the business was intended to extend beyond the trial period, and that this representation had been written down informally on a scrap of paper (which they were never able to produce) at the time of the deal. Mrs. Zuccarelli testified (the husband appeared as a witness only with respect to the later controversy over the fee) that DePamphilis thereupon advised that a suit could be brought to rescind the purchase (although it was 15 months since it took place) which would get the Zuccarellis their money back, with the extravagant assurance, as she put it, of a 99% chance of success. She also testified that the matter of bankruptcy was discussed

and that DePamphilis had said, since business was as bad as it was, he thought the time would come when they would actually have to close the store down and go bankrupt, but that "since we had property, he thought that it should be safeguarded and turned over to someone" and he "asked us if we knew of someone that we could turn the property over to and someone we could trust and have confidence in." The property referred to was the Zuccarellis' home in Belleville and a rented drug store property in the same town producing rent of $100 per month. DePamphilis did not specifically deny recommending a rescission suit and admitted bankruptcy was discussed at the conference, but said that he had advised against it upon learning of their other assets and that he had at no time suggested a conveyance of the real estate. He did not say whether or not the possibility had been raised by his clients or discussed.

DePamphilis personally did but little of his own legal work and had for some time been calling in Friedman to assist in litigation and complicated matters. This was done in this instance after the initial consultation, with the Zuccarellis' consent, and some few days later the first conference with Friedman was held in his office in Newark, with DePamphilis also present (as he was at all such sessions). There is no indication whether the latter had discussed the situation with Friedman in the interim. The picture was again canvassed and Friedman advised an action to rescind should be brought, with good chance of success. It was authorized. Bankruptcy was certainly discussed and Friedman was made aware of the Belleville real estate. He testified Mrs. Zuccarelli said she understood a bankruptcy proceeding could be instituted, placing this conversation however at his second and not the first meeting with the clients, but he advised it would not lie in view of the other assets and says it was never mentioned again. She testified on the contrary that bankruptcy was planned at the conference, to be instituted some six months later, and that she and her husband were asked by the lawyers "to see if we could get

someone who we would have confidence in who we could turn the property over to, and my husband said, 'Well, the only one I could think of is my uncle.' " (Such a course of action would only be of importance, of course, as a possible hedge against the contingency that the prospective rescission suit ultimately proved unsuccessful, the chattel mortgage was foreclosed and there was a complete failure of the business.)

Friedman denied he made any suggestion of a conveyance, but said that at the same conference, after bankruptcy was discussed and discarded, Mrs. Zuccarelli told him they owed Curran between $6,000 and $7,000 for loans he had been making to them for some time and wished to transfer the properties to him. He did not say any arrangements to do so were planned at that time, but testified that a few days later Curran came to his office with the Zuccarellis and DePamphilis and produced the bank book to his surprise, since proof of the indebtedness had not been asked for. Friedman said the book showed withdrawals totalling about $6,600, which Curran told him represented the loans and which Friedman computed would approximately equal the equity in the properties on figures of value and mortgage debt given him by the Zuccarellis. He said deeds to Curran were subsequently prepared, executed and recorded. Mrs. Zuccarelli testified that the bank book was produced at the suggestion of DePamphilis because he wanted to know whether there were any entries which would show a great deal of money had been withdrawn, because it had to be shown money had been received in exchange for the property. She further swore that when the book was examined by the lawyers, DePamphilis said the total withdrawals did not meet "the certain required amount," and that Curran was to withdraw and give them some more and that he in fact did shortly give them two checks for $650 each. They cashed the checks and the next day returned the proceeds to him. She was emphatic that they had never previously borrowed any money from him and did not owe him a cent.

Curran, an elderly gentleman, was called as a witness by the committee before Friedman and DePamphilis testified. His testimony as a whole obviously impressed the committee, and properly so. It, together with the physical facts surrounding the conveyance and subsequent happenings, convincingly established that there was no present or antecedent consideration for the conveyance, and that it was a pure sham undertaken for the purpose of concealing assets and defrauding or hindering creditors if such became necessary. The substance of his testimony was: late in October his nephew, whom he saw very infrequently, telephoned him and said he was probably going to lose his property, wanted to put it in the uncle's name, and asked him to come to Friedman's office and bring his bank book. He went to the office on a Saturday and met the Zuccarellis there, along with Friedman and DePamphilis, whom he had not previously known. The lawyers examined his bank book, saying that the Zuccarellis could not turn the property over to him without showing that they owed him money to be verified by withdrawals. He was not asked nor did he say whether they were indebted to him. In fact, up to this date he had had no business dealings with them, they had never borrowed from him and owed him nothing. The lawyers said the book didn't show enough withdrawals to take the property over and they told him to withdraw $1,300 more and give it to the Zuccarellis. He did this on Monday, October 29 (at the hearing his pass book showed such an entry), and gave the checks for the amount to Mr. Zuccarelli, who cashed them and give him back the money the next day. He still had this cash at his home and offered to show it to the committee if any members wished to come to the house to examine it. He received no income from the properties after the conveyance and paid no taxes or other charges. He said he had participated reluctantly, "I didn't want to do it, it was crooked work," but had done so to save the house for his nephew who was partly blind and for whom he felt sorry.

The properties were conveyed to Curran, subject to existing mortgages, by two deeds prepared by Friedman, dated October 31, 1956 and acknowledged before him by the Zuccarellis the same day. They were recorded on November 2 and, when returned to Friedman after recording, were sent on to De-Pamphilis. Each deed bore $5 in revenue stamps, cancelled by Friedman, which would indicate on the face an outright conveyance for an identical consideration in each instance of not over $4,500. No instrument evidencing satisfaction of any debt was prepared or executed, Friedman testifying that he did not know or inquire whether the transfers were in satisfaction or only for security. There was no title examination.

During the course of his testimony, Friedman produced a slip of paper, which he said was not in his handwriting but in that of one of the Zuccarellis, purporting to set forth a checked list of the withdrawals shown in the Curran bank book, compiled at the time of its examination in his office. The list is in two handwritings. In the first are set down eight amounts with dates—one in 1939, two in 1940, two in 1941, two in 1950 and one in April 1956. In a different handwriting is another item of $500 in 1948 (no specific date given), with a total for the nine items of $5,312.04. Then is listed, also in the different handwriting, the $1,300 withdrawal of October 29, 1956, giving a grand total of $6,610.04. The 1948 item, the second 1950 item and the April 1956 item are not found in the pass book presented to the committee by Curran when he testified. The total of the withdrawals shown therein over the same period, including the $1,300, was only $5,272. Friedman testified that he was surprised to see the recent $1,300 withdrawal in the book, but made no inquiry to determine the circumstances or what the Zuccarellis did with the money. The committee called the attention of both lawyers to the fact that a considerable portion of the items would have been long since barred by the statute of limitations. It appeared this question had not been mentioned or discussed with the clients.

Friedman produced before the committee the originals of two closing statements which he said he had prepared to cover each transaction, presumably at the closing on October 31. Admittedly neither had been signed by anybody or copies given to anyone. The instruments are not dated but say "as of November 1, 1956." In each instance there is set forth "purchase price" (a value figure given by the Zuccarellis), tax and insurance adjustment figures and an exact amount as "Balance due on mortgage." In the statement covering the home property the balancing item is denominated "Amount due to [sic] Purchaser—$4495.87." The balancing figures in the statement relating to the drug store premises are two in number, one of which is strange indeed. It reads: "Cash—$1300.00" and is followed on the next line by "Due to [sic] Purchaser—$1334.22." Friedman was not asked about this mysterious cash item. Concededly, no cash passed at the closing. It, of course, corresponds in amount to Curran's withdrawal of October 29, turned over to the Zuccarellis and repaid to him in cash the next day.

Friedman could give the committee no explanation as to the $5 in revenue stamps on each deed, nor could DePamphilis for that matter. The total stamps would evidence an approximate consideration of $9,000, whereas he had testified he had computed the antecedent debt amounted to only $6,600. Based on the balancing figures in the closing statements, the amount of stamps required for one deed would have been $4.95 and for the other $3.30.

The rescission suit was commenced against the sellers of the store business on the same day as the closing. An answer and counterclaim for foreclosure of the chattel mortgage were filed. Cross-depositions were taken of all parties from which it appeared to Friedman that his clients' case for rescission was not at all strong. Shortly thereafter, however, a broker produced a buyer for the business and the original sellers consented to a sale without acceleration of the mortgage balance. The sale was closed on December 26, with the purchaser assuming the mortgage. The Zuccarellis gave a

release to their sellers on the claim for rescission, and the suit and counterclaim were discontinued. Their financial difficulties were thereby alleviated, for the time being at least, and there had been no loss to creditors.

The true nature and purpose of the conveyances to Curran are further conclusively demonstrated by events which transpired with respect to the handling of the properties after the transfer and the ultimate disposition of them. These were matters handled by DePamphilis, and, incidentally, had not been mentioned at all in his answer to the complaint. Friedman testified he had no connection or acquaintance with them. By instrument dated December 10, 1956, prepared by DePamphilis and sent to Curran for execution, the latter gave the lawyer power of attorney to collect the rents and manage the drug store property. No mention of the Zuccarelli home was made therein. DePamphilis purported to say that Curran asked him to manage the properties for him, but it is clear from the latter's testimony that he did not, since he considered himself nothing more than a nominee of the title and signed the power at DePamphilis' request without fully understanding the nature of it.

The Zuccarellis had continued to live in their home. DePamphilis at first testified they paid him, representing Curran, $80 a month after the conveyance, but later said they paid him only enough, which together with the $100 rent from the drug store, would equal the total monthly mortgage payments of $173.52 on both properties, and sent Curran the difference. The latter had testified he never got a cent from anyone. The record was silent as to the collection of rents or payment of mortgage installments between October 31 and December 10, although prior to the latter date DePamphilis had procured insurance endorsements in Curran's name and forwarded them to the mortgagees with advice of the change of title. After December 10 he wrote the drug store tenants informing them that "My client, Edward Curran" had "purchased" the property and had authorized him to collect the rents. In testifying before the

committee he was most evasive as to the amounts he had collected and his disposition thereof. He was asked to submit, after the hearing, copies of his records thereon, but all he sent the committee were photo copies of checks and letters of transmittal, showing payment late in December of the mortgage installments due December 1 and after the middle of January of those due on the first of that month.

The properties were reconveyed by Curran, by deeds dated February 4, 1957, to 291 Union Avenue, Inc., a corporation formed shortly before that date by DePamphilis for the Zuccarellis, in which Mrs. Zuccarelli's son by a prior marriage held ten shares of the stock and Mr. and Mrs. Zuccarelli one share each. DePamphilis' testimony concerning how this came about was most unconvincing. He said that not too long after the sale of the store business, the Zuccarellis came to him and said that they wanted to form a corporation, that they had settled their financial matters with Curran and that the properties were to be conveyed to the new entity. He further asserted Curran thereafter called him in confirmation. On the other hand, Curran testified that he was asked to sign the February deeds by DePamphilis, and Mrs. Zuccarelli said that right after the sale of the business in December they wanted their property back as soon as possible and asked DePamphilis to form the corporation, but completion of the matter was delayed until February because the latter told them "these things take time and we had to wait." DePamphilis stated to the committee that he represented Curran, whom he had not seen since the previous October, and not the Zuccarellis, in the reconveyance, although he did not charge him a fee, and made no effort to inquire or be assured that the former alleged debt owed him by the Zuccarellis had been taken care of to his satisfaction. There was no closing statement or revenue stamps affixed to the deeds because he then realized, for the first time, so he asserted, that the transfer to Curran had been only in the nature of security.

The evidence is overwhelming and there cannot be the slightest doubt but that the two deeds to Curran were made by the Zuccarellis with actual intent to hinder, delay or defraud present or future creditors, and so were fraudulent as to such creditors at the time of delivery and subject to being set aside if any creditor was injured thereby. *R. S.* 25:2–13 and 15. Consideration was non-existent.

■ We are fully satisfied that there was adequate clear and convincing evidence justifying the committee in reaching the conclusion that both respondents recommended the transfers and participated in a scheme to defraud creditors. Much depended on the credibility of witnesses whom the committee saw and heard. Their assessment thereof, as demonstrated by the conclusion reached, is entitled to due regard on review. Even more convincingly supportive here are the incontrovertible physical facts and course of events to which we have alluded. Such clearly overcomes any doubts that might arise as to the complete reliability of the testimony of Mrs. Zuccarelli in view of some of her extravagant assertions and her motive in seeking to gain a reduction in legal fees. Even if it be considered that the idea of the transfers did not originate with the lawyers, there was ample credible evidence to establish that they participated in and handled the transaction with actual knowledge of its true character and purpose. We perceive no distinction in principle between the acts of Friedman and those of DePamphilis in this respect.

■ Any such conduct is unquestionably unethical and unprofessional despite the fact it may be thought to serve the client and no one may be actually injured. It is dishonorable, enables violation of the law and brings the profession into disrepute. *Cf. In re Greenberg,* 21 *N. J.* 213, 221 (1956). *Canon* 29 of the *Canons of Professional Ethics* imposes on all attorneys the obligation to "strive at all times to uphold the honor and to maintain the dignity of the profession." "The office of attorney does not permit, much less does it demand of him for any client, violation of law or

any manner of fraud or chicane." *Canon* 15. No lawyer should "render any service or advice involving disloyalty to the law whose ministers we are \* \* \*" and "when rendering any such improper service or advice, the lawyer invites and merits stern and just condemnation." *Canon* 32. The attitude of respondents is best expressed in their own words, Friedman said: "I did what I was requested to do, namely draw a conveyance," and DePamphilis: "I was only following the wishes of my clients." The lawyer "must obey his own conscience and not that of his client." *Canon* 15. He "advances the honor of his profession and the best interests of his client when he renders service or gives advice tending to impress upon the client and his undertaking exact compliance with the strictest principles of moral law." *Canon* 32.

Since this type of conduct has not previously been before us in a disciplinary proceeding, we feel that the fulfillment of our duty and the interests of the profession and the public will be best and properly served in this particular instance by the imposition of a reprimand.

Respondents are accordingly reprimanded.

*For granting reprimands*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*Opposed*—None.