## 23465

In the Matter of John C. CONWAY, Jr., Respondent.

(409 S.E. (2d) 357)

Supreme Court

*Attorney General T. Travis Medlock, Deputy Atty. Gen. William K. Moore* and *Asst. Atty. Gen. James G. Bogle, Jr.,* Columbia, *for complainant.*

*G. Thomas Cooper, Jr.,* Camden, *for respondent.*

Heard July 1, 1991.

Decided Aug. 12, 1991.

*Per Curiam:*

This is an attorney grievance matter in which John Condon Conway (respondent) has been charged with engaging in: conduct that constituted fraud, dishonesty, or deceit; conduct that had the appearance of impropriety; conduct demonstrating an unfitness to practice law; conduct which brings the legal profession into disrepute; conduct whereby he entered into a business transaction with a client where he and his client had conflicting interests, without full disclosure to the client; and illegal conduct involving moral turpitude, all of which were in violation of the Code of Professional Responsibility and the Rule on Disciplinary Procedure.

## FACTS

Respondent formed a corporation with Howard Lee Snyder (Snyder), Theodore Kornya (Kornya), and Randolph Cooper (Cooper) for the purpose of buying and developing certain acreage on James Island, South Carolina, known as Seaside Plantation. The corporation was known as Seaside Development Corporation of Charleston, Inc. (Seaside). Respondent was president of and attorney for Seaside. The charges against him arose out of the following transactions:

### 1. *$200,000 Payment*

On March 7, 1985, Seaside closed a loan with Banker's First Mortgage Corporation of Georgia (Banker's First). Respondent directed Cooper, also an associate in his firm, to write him a check for $200,000 out of the proceeds of that loan. Snyder also received $200,000. Respondent characterized the payment as a loan and produced a demand note he had signed. However, there was no due date, no collateral, no repayment schedule, and no interest on the loan. Kornya was never told

about the payments and only found out about them through Cooper in 1986.

In addition, respondent contended that he had placed half of the money in a certificate of deposit with Banker's First as collateral. He testified that he had placed the other $100,000 in an interest bearing account at Banker's First. Respondent, however, could not give a reason why the $100,000 certificate of deposit pledged to the bank had not been paid back to Seaside on its release. Nor could he explain what happened to the other $100,000. Although Snyder remitted $200,000 to Seaside upon the release of the certificate of deposit he had pledged to Banker's First, respondent never paid back any of the $200,000 he had received.

### 2. *$52,599.99 Payments*

Also at the time of the above-referenced closing, $98,000 was paid to the Quarrier Company, Inc. (Quarrier) allegedly for costs of engineering and design work. However, upon receiving the funds, the principal of Quarrier, Charles Samuel Steinert (Steinert), wrote a check back to respondent for $24,300. Steinert testified that on subsequent occasions, he wrote checks to respondent for $7,000.00, $5,800.00, $7,933.33, $1,666.66, $2,425.00 and $3,475.00, for a total of $52,599.99, after receiving draws from Banker's First. Steinert stated that, while in retrospect the payments looked like "kickbacks," respondent, as his attorney and as the attorney for Seaside, had assured him at the time that the payments were legitimate. He further testified that respondent had not performed any services or supplied any materials that would have entitled him to any of the checks.

Snyder received similar payments, which he thought were loans against future profits. He repaid the money to Seaside. Neither Kornya nor Cooper knew anything of the Quarrier payments until they insisted on an audit of Seaside. Respondent has not repaid Seaside any of the money he received from Quarrier.

### 3. *$82,500.00 Payment*

In addition to Seaside Plantation, Seaside undertook to develop Seaside Village, a retirement community, which was to be financed by a bond issue for $16,500,000.00. Respondent was responsible for obtaining the bond issue. Prior to closing

on the issue, respondent, Kornya, Cooper, and Snyder, disagreed on whether to pay a fee or commission to respondent or to his and Snyder's company, known as the Conder Company. Kornya, Cooper and Snyder prevailed in a vote on the issue, and it was agreed that no commission would be paid to either respondent or Conder Companies because of certain conditions placed on the money.

On or about December 31, 1985, however, a cashier's check in the amount of $82,500.00 was issued at the instigation of respondent and made payable to the Conder Company. Respondent deposited the check in his personal bank account on or about January 3, 1986. Cooper, Snyder, and Kornya did not know about the payment until it was discovered several months later. Respondent characterized the payment as a commission but admitted that he should not have taken the $82,500.00.

Respondent testified that he had repaid approximately $90,000.00 to Seaside but could not produce any documentation of repayment.

The Hearing Panel found that respondent had violated the Rule on Disciplinary Procedures Paragraphs 5(A) (violation of the Oath of Office to practice law); 5(B) (acts or omissions violating the Oath of Office or the Code of Professional Responsibility); and 5(D) (conduct tending to bring the legal profession into disrepute); and DR1-102(A)(3) (conduct involving moral turpitude), DR1-102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation), and DR1-102(A)(6)[1] (conduct that adversely reflects on fitness to practice law)[2] of the Code of Professional Responsibility and recommended suspension for an indefinite period from the office of Attorney at Law. Respondent neither objected to nor filed exceptions to the Panel's findings. The Executive Committee reviewed the matter and adopted the Panel's findings of fact and conclusion; however, the committee disagreed with the sanction recommended by the Panel and unanimously advocated disbarment.

---

[1] In its report, the Panel cited DR2-106(A) (agreement, charging, or collection of illegal or clearly excessive fee). We believe this was a typographical error and that the correct rule is DR1-102(A)(6).

[2] The charges represented by DR1-102(A)(3), DR1-102(A)(4), and DR1-106(A) arose under the Code of Professional Responsibility. The Model Rules of Professional Conduct were enacted effective September 1, 1990. The corresponding provisions of the Model Rules of Professional Conduct are 8.4(a-d).

## CONCLUSION AND SANCTIONS

In light of the testimony and exhibits in this case, we agree with the Executive Committee that disbarment is the appropriate sanction for respondent's unauthorized appropriation of corporate funds. Respondent's abuse of the trust placed in him as an attorney and as a corporate officer requires his removal from the profession. *Cf. Matter of Mitchell*, 283 S.C. 65, 319 S.E. (2d) 705 (1984). Respondent has also violated DR5-104(A).[3] Respondent was originally charged with violation of this section but neither the Hearing Panel nor the Executive Committee specifically found him guilty. We hold that the evidence warrants a finding that respondent violated DR5-104(A) in addition to DR1-102(A)(3), DR1-102(A)(4) and DR1-102(A)(6) of the Rules of Professional Responsibility and paragraphs 5(A), (B) and (D) of the Rule on Disciplinary Procedure. We take this opportunity to caution the bench and bar of the dangers of engaging in business transactions with clients, for this case is exemplary of the potential for abuse such relationships present.

An attorney who enters into business with his client does not, in the eyes of his client or the public generally, shed his professional standing and obligation, and there is no just reason why he should be permitted to do so. Measures must be taken to ensure that the attorney's personal interests do not conflict with those of his client. An attorney should approach such business transactions with caution and must carefully explain to his client the need for independent legal advice. When a lawyer has a personal stake in a business in which his client is involved, he must see to it that his client understands that his objectivity and his ability to give his undivided loyalty may be affected. *Matter of Smyzer*, 108 N.J. 47, 527 A. (2d) 857 (1987). In view of the trust placed in attorneys by their clients and attorneys' often superior expertise in complicated financial matters, they must take every possible precaution to ensure that clients are fully aware of

---

[3] DR5-104(A) of the Code of Professional Responsibility provides:

(A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

the risks inherent in the proposed transaction and of the need for independent and objective advice. *Id.*

■ In addition, an attorney does not lose his fiduciary responsibility as an attorney in a business context. *Matter of Estate of Schuldt,* 428 N.W. (2d) 251 (S.D. 1988). He will still be held to the standards and obligations of his profession. As we have said with reference to DR5-104,[4] "a lawyer runs a high risk in mixing personal business with his professional business, and when he does so he is held to high standards." *In the Matter of Belser,* 269 S.C. 682, 239 S.E. (2d) 492 (1977).

■ While neither DR5-104(A) nor Rule 1.8(a) forbid attorney-client business relationships, they require attorneys to maintain the highest professional and ethical standards in their dealings with clients. No exceptions to that duty exist merely because an attorney chooses to become involved in business transactions with his clients. *Smyzer, supra,* 527 A. (2d) at 863. Accordingly, we warn members of the bar to exercise utmost care when pursuing business relationships with clients.

In accordance with the facts and conclusion set forth above, it is ordered that respondent be disbarred from the practice of law in this state. Respondent shall file an affidavit with the Clerk of this Court showing he has fully complied with the provisions of Paragraph 30 of the Rule on Disciplinary Procedure within fifteen (15) days of service of this opinion.

Disbarred.

---

[4] Rule 1.8(a) of the Model Rules of Professional Conduct now governs this particular area of professional responsibility in a somewhat stricter manner:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) The client consents in writing thereto.