491 S.E.2d 252

**In the Matter of Karl L. KENYON and
Robert P. Lusk, Respondents.**

**No. 24692.**

Supreme Court of South Carolina.

Heard June 18, 1997.
Decided Sept. 22, 1997.

Attorney General Charles Molony Condon, and Senior Assistant Attorney General James G. Bogle, Jr., Columbia, for complainant.

Kermit S. King, Columbia, and Lowell W. Ross, Seneca, for respondents.

PER CURIAM.

This is an attorney disciplinary matter.[1]  The Panel found respondents committed misconduct and recommended respondent Kenyon receive a fifteen-month suspension and respondent Lusk receive a private reprimand.  The Interim Review Committee adopted the Panel's findings of facts and conclusions of law.  However, the Committee disagreed with the Panel about the appropriate sanctions.  The Committee recommended by a 5 to 1 vote respondent Kenyon receive an indefinite suspension.  One member recommended respondent Kenyon be disbarred.  The Committee unanimously recommended respondent Lusk receive a public reprimand.  We agree with the Committee's recommendations.

## DISCUSSION

Respondents, partners in a firm, committed misconduct in handling the affairs of Robert Meredith.  Meredith had been a

---

1.  The conduct in this action took place prior to September 1, 1990, and the adoption of the Rules of Professional Conduct.  Therefore, the Code of Professional Responsibility applies.

long-term client of the firm. On October 6, 1988, Meredith, who was being sought by the federal authorities for drug violations, committed suicide. He was survived by his second wife, Louise Meredith, and two children, Robert, Jr., and Rosemary.

■ For sometime prior to his death, Meredith had been in trouble with the local and federal governments for tax delinquency problems, drug activities, and various other illegal conduct. Several liens and foreclosures had been instituted against Meredith's assets. Claims totaling at least $548,000 plus interest were filed against Meredith's estate. This disciplinary deals with the disposition of Meredith's property and assets.

1) Property Transfers

A) 122 Rockingham Road

A house at 122 Rockingham Road in Greenville was the marital home of Meredith and his first wife, Janice Gautreaux. Janice and Meredith divorced in 1974. As part of the divorce decree, Janice was to have use of the house until she remarried. If she remarried the house was to be sold with the proceeds to be placed in trust for Rosemary and Robert, Jr. Thereafter, if she divorced or was widowed, the money in trust could be used to purchase another house for her and the children. Meredith was to pay the insurance and taxes on the house. At the time of Meredith's death, the house remained in his name and Janice and the children lived in it.

On March 31, 1989, the house was conveyed to Advocates, Inc., a corporation owned solely by respondents. Advocates then obtained a mortgage on the property in the amount of $250,000 from a corporation controlled by respondents, Expansion Capital. The house was eventually re-conveyed to Robert, Jr., and Rosemary and the mortgage was satisfied.

■ Janice testified neither respondent informed her of potential conflicts of interest or that she should contact independent counsel. Respondents also testified they did not inform her of any conflicts. When an attorney has a personal stake in a business in which his client is involved, he must see to it that his client understands that his objectivity and his

ability to give his undivided loyalty may be affected. The attorney should ensure that his client is fully aware of the risks inherent in the proposed transaction and of the need for independent and objective advice. *In re Conway,* 305 S.C. 388, 409 S.E.2d 357 (1991).

In addition to the potential conflicts of interest, there is an issue whether the conveyance itself was fraudulent. Kenyon testified that he considered the conveyance to be a sale contemplated by the divorce decree because Janice was about to be remarried. However, Kenyon himself testified he felt the conveyance was necessary to avoid creditors. He also stated he re-conveyed the house to the children when none of the governmental agencies questioned him about the house (i.e. when he thought that the house was not going to be seized or levied against for Meredith's past debts or criminal activities).[2]

■ Relying on civil case law, respondents attempt in their brief to argue this transfer was not a fraudulent conveyance because creditors were not injured and the property was not the debtor's (Meredith's) in the first place. The property was deeded to Meredith. Creditors may very well have been harmed. Assets passed outside probate and were transferred to avoid seizure. Furthermore, and more importantly, acts sufficient to constitute the civil definition of fraudulent conveyances do not have to be found for us to find misconduct. We do not have to find fraudulent conveyances—only fraudulent or dishonest conduct. In *In re Hockett,* 303 Or. 150, 734 P.2d 877 (1987), an attorney disciplinary involving an attorney who assisted his client in transferring assets to avoid creditors, the court found no tortious fraudulent conveyances. However, the court specifically found that "assisting clients to cheat creditors is 'dishonesty' under DR 1–102(A)(4)."[3] We find respondents committed misconduct in conveying this property.

---

2. There is also the additional problem of conveying a house titled in a deceased person's name without the house passing through probate.

3. Other jurisdictions have also addressed situations involving similar misconduct and fraudulent conveyances. *Florida Bar v. Scott,* 566 So.2d 765 (Fla.1990) (attorney who concealed property for a friend to avoid creditors committed misconduct); *In the matter of Breen,* 113 N.J. 522, 552 A.2d 105 (1989) (attorney who fraudulently prepared four

## B) Anderson County Property

At the time of Meredith's death, Louise was president of a corporation, Twin States, Inc. Twin States owned a parcel of land in Anderson County. This property was conveyed to Advocates on November 2, 1988. Fifteen months later, Advocates conveyed this property to Robert Peeler for $5.00. Allegedly, there was an additional oral agreement under which Peeler supplied Louise, Robert, Jr., and Rosemary with cars from a company he owned, Carolina Leasing, and paid off a $50,000 note owed to Meredith's mother, Mary Thomas. Further, if the property was successfully developed, Peeler was to pay an additional $50,000. Peeler mortgaged the property for $168,000 immediately after the transfer. No additional money was paid for the property and Peeler eventually filed for bankruptcy.

Again, respondents did not inform Louise of the potential conflicts of interest. Further, Kenyon testified that although the property was not tied to Meredith, he thought there was a serious question about whether the property could be seized because the money used to purchase the property could be tied to Meredith and his drug activities.

## C) 42 Harborgate Condo

Several months prior to Meredith's death, Louise entered into an agreement with Perpetual Federal Savings to buy a condominium at 42 Harborgate with a purchase price of $83,500. Louise put $5,000 down and made payments. After Meredith died, Louise transferred her rights to purchase the condo to Advocates. Advocates then paid off the balance on the contract, $21,000, and obtained a $60,000 mortgage on the condo. Respondent Kenyon testified he considered this money to be his and used it for "business purposes." Louise has since remarried and is no longer living in the condo. She is currently renting the condo to someone for $1,000 per month.

mortgages against his residence and transferred title to a friend to defraud creditor was disbarred); *In the matter of De Pamphilis,* 30 N.J. 470, 153 A.2d 680 (1959) (attorney received public reprimand for recommending transfers to defraud creditors); *In re Hockett, supra* (attorney who handled divorce proceeding so as to preclude creditors of husband of obtaining assets through fraudulent conveyances was suspended).

Again, respondents did not inform Louise of any potential conflicts and the conveyance was an attempt to avoid creditors.

D) ⅖th Interest in Inherited Property

In August 1988, Meredith allegedly agreed to sell his ⅖th interest in property he inherited from his father to Floyd Brown. This interest was worth $59,625.34. This property previously had been levied by the federal government. Respondent Kenyon testified that the levy was released when Floyd Brown paid the IRS to release the levy.[4] Allegedly Meredith and Brown entered into a contract whereby Brown was to buy the property for $12,500 several months prior to Meredith's death. However, respondents contend the deed was never recorded showing the transfer of the property. After Meredith's death, Louise, as the administrator of Meredith's estate, conveyed the deed for this property to Brown. No money was exchanged.

Respondent Kenyon testified he had prepared the original deed transferring the property from Meredith to Brown but that he was unable to locate a copy of the deed and did not know why the original was not filed. Kenyon testified he thought under S.C.Code Ann. § 62-3-715(3) (Supp.1996) Louise, as administrator, had the authority to convey the deed. We need not address whether Louise could transfer the property under this section, since the property should have been allowed to properly pass through the probate court. Kenyon admitted he did not inform the probate court about this transaction.

2) Probate court

Respondents filed forms with the probate court to have Louise appointed as administrator so that the ⅖ths interest property discussed above could be conveyed. The probate court repeatedly contacted respondents about filing further documents with the court. After asking for an extension, respondents ignored the probate court's requests and the

4. Meredith could not pay for the release of the levy directly because of the amount he owed the government—any funds he attempted to use to do such would also be levied against.

probate court eventually closed the estate pursuant to its Rule 4 for defunct cases. Respondents contend there was nothing to file because the estate did not generate any income.

Respondents take inconsistent views towards the ownership of the above property and transfers. On one hand they claim Meredith did not own any property and, therefore, they did nothing wrong by not listing any assets with the probate court. On the other hand, they claim they had the family take the actions they did (i.e. convey the property to corporations owned or controlled by respondents) to protect the property because of Meredith's drug activities and other financial problems which could result in forfeiture or seizure of the property. Obviously, respondents were aware that the properties may have ultimately been found to be Meredith's and subject to these other claims.

Respondents allege none of their clients were injured in any way and, in fact, were better off financially because the creditors and other lienholders were prevented from seizing all of the property. Granted respondents' clients overall may be in better financial positions, but Meredith's or Louise's creditors might have been paid had respondents allowed the property to be disposed of properly. While some of the property may have ended up in the right hands, it was not for respondents to circumvent the proper channels and make these determinations themselves. In conclusion, such conduct is unquestionably unethical and unprofessional, despite the fact it may be thought to serve the client and no one may be actually injured.

### 3) Co-mingling of funds

█ Rosemary and Robert, Jr., received checks from both respondent's escrow account and several other accounts over the years. Respondent Kenyon testified he wrote the checks from the escrow account out of fees he was owed. He testified he wrote the checks directly out of the escrow account to avoid having to withdraw the fees and place it in the firm's operating account and then write the children checks. Several checks were written out of other client accounts such as K.W. International and the Advocates account. Respondents again contend this was because there were fees in these accounts

which had not been withdrawn. They further claim K.W. International was aware of these disbursements. There were no documents backing up these contentions. In fact, Kenyon testified he had not fully determined what amount he was owed from K.W. but "there was an amount I was owed." We have made it abundantly clear that an attorney is charged with a special responsibility in maintaining and preserving the integrity of trust funds. *See Matter of Amick,* 288 S.C. 486, 343 S.E.2d 623 (1986); *Matter of James,* 289 S.C. 4, 344 S.E.2d 378 (1986).

We find respondents violated: DR7–102(A)(5) for failing to disclose facts to probate court; Rule 3.3(a)(2) for failing to respond to communications from the probate court and failing to reveal assets; DR1–102(4) and Rule 1.2(d) for assisting a client to engage in criminal or fraudulent conduct; Rule 1.2(e) for failing to consult with clients about the limitations the rules of professional conduct place on lawyers; DR7–102(B)(1) failing to require clients rectify a fraud or revealing the fraud; DR5–105 for failing to inform and receive consent about conflict of interests; and Rule 1.7(a) for representing a client when the client's representation is limited by conflicts with other clients or the attorney's own interest.

Respondent Kenyon admitted at the hearing that he was more culpable than respondent Lusk for the misconduct committed in the handling of these transactions. We agree and accordingly find the misconduct of respondent Lusk warrants a public reprimand. The misconduct of respondent Kenyon warrants an indefinite suspension. Respondent Kenyon shall file an affidavit with the Clerk of Court within fifteen days of the date of the filing of this opinion in compliance with Rule 30 of Rule 413, SCACR.