849 A.2d 423

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Allan J. CULVER, Jr.**

**Misc. AG No. 35, Sept. Term, 2002.**

Court of Appeals of Maryland.

May 13, 2004.

Melvin Hirschman, Bar Counsel and James P. Botluk, Asst. Bar Counsel, Atty. Grievance Commission of Maryland, for Petitioner.

Byron L. Warnken, Baltimore, for Respondent.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

RAKER, Judge.

The Attorney Grievance Commission, petitioner, acting through Bar Counsel, filed a Petition for Disciplinary Action

against Allan J. Culver, Jr., respondent, alleging violations of the Maryland Rules of Professional Conduct. The Commission charged respondent with violating Maryland Rules of Professional Conduct 1.2 (Scope of representation),[1] 1.3 (Diligence),[2] 1.5 (Fees),[3] 1.7 (Conflict of interest: General rule),[4]

---

1. Rule 1.2 provides, in pertinent part, as follows:

 "(d) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law."

2. Rule 1.3 provides as follows:

 "A lawyer shall act with reasonable diligence and promptness in representing a client."

3. Rule 1.5 provides, in pertinent part, as follows:

 "(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
 (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
 (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
 (3) the fee customarily charged in the locality for similar legal services;
 (4) the amount involved and the results obtained;
 (5) the time limitations imposed by the client or by the circumstances;
 (6) the nature and length of the professional relationship with the client;
 (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
 (8) whether the fee is fixed or contingent.
 (b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation."

4. Rule 1.7 provides, in pertinent part, as follows:

 "(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
 (1) the lawyer reasonably believes the representation will not be adversely affected; and

1.15 (Safekeeping property),[5] 3.1 (Meritorious claims and contentions),[6] 3.2 (Expediting litigation),[7] 3.3 (Candor toward the tribunal),[8] 3.4 (Fairness to opposing party and coun-

(2) the client consents after consultation.

(c) The consultation required by paragraphs (a) and (b) shall include explanation of the implications of the common representation and any limitations resulting from the lawyer's responsibilities to another, or from the lawyer's own interests, as well as the advantages and risks involved."

5. Rule 1.15 provides, in pertinent part, as follows:

"(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation."

6. Rule 3.1 provides as follows:

"A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. A lawyer may nevertheless so defend the proceeding as to require that every element of the moving party's case be established."

7. Rule 3.2 provides as follows:

"A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."

8. Rule 3.3 provides as follows:

"(a) A lawyer shall not knowingly:
(1) make a false statement of material fact or law to a tribunal;
(2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client;
(3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or
(4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

(b) The duties stated in paragraph (a) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

(c) A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.

sel),[9] and 8.4 (Misconduct).[10] Pursuant to Maryland Rule 16–752(a), we referred the matter to Judge John O. Hennegan of the Circuit Court for Baltimore County to make findings of fact and proposed conclusions of law. Judge Hennegan held an evidentiary hearing and concluded that respondent had violated Rules 1.2(d), 1.3, 1.5(a) and (b), 1.7(b), 1.15(a), 3.1, 3.2, 3.4(d), and 8.4(b), (c), and (d).

## I.

Judge Hennegan made the following findings of fact and conclusions of law:

"On July 9, 2002, the Attorney Grievance Commission of Maryland filed a Petition for Disciplinary Action, alleging that the Respondent, Allan J. Culver, Jr., engaged in misconduct in violation of the Maryland Rules of Professional Conduct in connection with his representation of Ms. [the

---

(d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse.
(e) Notwithstanding paragraphs (a) through (d), a lawyer for an accused in a criminal case need not disclose that the accused intends to testify falsely or has testified falsely if the lawyer reasonably believes that the disclosure would jeopardize any constitutional right of the accused."

**9.** Rule 3.4 provides, in pertinent part, as follows:
"A lawyer shall not:

\* \* \*

(d) in pretrial procedure, make a frivolous discovery request or fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party"

**10.** Rule 8.4 provides, in pertinent part, as follows:
"It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
(d) engage in conduct that is prejudicial to the administration of justice"

client] in her divorce case and in related matters. The Court of Appeals assigned this matter to this Court to conduct a trial and to make findings of fact and conclusions of law. The trial was held May 14 through 16, 2003.

"The Court heard testimony from Ms. [the client]; her friend, Susan Butzner; and Matt R. Ballenger, Esquire, the attorney who represented Ms. [the client] in her subsequent lawsuit against Mr. Culver. The parties also introduced a number of exhibits, as well as a transcript of the testimony of Allan M. Grochal, Esquire, before the Inquiry Panel in this matter.

"Bar Counsel, on behalf of the Attorney Grievance Commission, filed a Petition for Disciplinary Action alleging that Respondent violated Rules 1.2, 1.3, 1.5, 1.7(b), 1.15, 3.1, 3.2, 3.3, 3.4 and 8.4(b), (c) & (d) of the Maryland Rules of Professional Conduct. The allegations concern or pertain to three matters. The first allegation is that Respondent incompetently represented Ms. [the client], did not act diligently, charged unreasonable fees, and engaged in other misconduct in the course of her divorce case.

"The second allegation is that during his representation of Ms. [the client], Respondent coerced and forced Ms. [the client] to have sexual contact with him. The third allegation involves Respondent's actions while Ms. [the client]'s suit was pending against him: he allegedly used improper means to avoid being deposed, avoid trial, and avoid paying the funds he agreed to settle the case.

"[The client] testified that she retained Mr. Culver[1] in March 1993 to represent her in connection with her divorce case after seeing his advertisement in a telephone directory. Although the advertisement promised a free initial consultation, Respondent charged her fifty dollars for their first meeting. Ms. [the client] explained that she was very distraught about her divorce because her husband had vowed to do whatever it would take to get custody of the parties' two children. Mr. Culver's retainer agreement failed to advise her of his fee, but billed her on roughly a monthly basis. Pet'r Ex. No. 24. Those bills show that

Respondent initially charged her $125.00 per hour, then later raised his rate to $150.00. Pet'r Ex. No.'s 25, 26, 27.[2] Ms. [the client] testified that Mr. Culver never informed her that he was increasing his billing rate. Many of the bills submitted to Ms. [the client] by Respondent do not reflect the hours involved for the particular task.

"During the course of the representation, Mr. Culver failed to timely file answers to interrogatories on behalf of Ms. [the client]. Pet'r Ex. No. 2—

---

[1] Mr. Culver was admitted to the Bar on June 21, 1978.

[2] Pet'r Ex. No. 27 December 15, 1993, indicates a charge of $250.00 per hour: Court preparation re: exceptions.

Motion for Sanctions. Ms. [the client] testified that she gave Mr. Culver all of the information he requested in order to respond to the interrogatories within a few days of Respondent asking for the information. The circuit court entered an order granting sanctions against Ms. [the client], precluding her testimony and dismissing her counterclaim. Pet'r Ex. No. 2—Order dated August 12, 1993. Respondent was successful in having the sanctions removed. He billed Ms. [the client] for those services, even though Respondent was personally at fault for the failure to answer interrogatories. Pet'r Ex. No. 26 August 18, 1993; Aug. 20, 1993; August 23, 1993; Aug. 31, 1993; Sept. 3, 1993; Oct. 18, 1993; Oct. 28, 1993.

"During the course of the representation, Ms. [the client] experienced financial difficulties, in part due to the attorney fees in excess of $23,000 she paid to Respondent. Ms. [the client] testified that Mr. Culver advised her to obtain more credit cards and take cash advances on those cards to pay his fees. Ms. [the client] expressed concern about incurring that debt, but Mr. Culver explained that she would not have to repay that money because he would represent her to have the debts discharged in bankruptcy.

"Ms. [the client] testified that she attended a master's hearing in her divorce case on September 9, 1993. Mr. Culver represented her at that hearing. Susan Butzner was

also present and testified at the master's hearing. That evening, Ms. [the client] received a telephone call from Mr. Culver. Mr. Culver insisted that he met with her that evening so that Ms. [the client] could sign papers that, he claimed, had to be presented to the court that following morning. Ms. [the client] agreed to meet Respondent at a restaurant, 'Bahama Mama's,' which was near Ms. [the client]'s home. Ms. [the client] arranged to have Susan Butzner accompany her to the restaurant. Mr. Culver arrived late. He was accompanied by a few friends who came with him. Ms. [the client] repeatedly asked to sign the papers, but Mr. Culver never produced them. Eventually, Mr. Culver left to buy gasoline and Ms. [the client] had Ms. Butzner drive her home.

"Ms. [the client] testified that Mr. Culver, shortly thereafter, unexpectedly arrived at her house. He said that he wanted to see the condition of the house because [the client's husband] had raised allegations that Ms. [the client] was not a good housekeeper. Ms. [the client]'s two sons were asleep upstairs. At Respondent's request, Ms. [the client] showed him the children's playroom in the basement. There, Respondent forced her to the ground, pulled up her blouse and bra, pulled down her pants and proceeded to force her to have sexual intercourse with him. Ms. [the client] repeatedly objected. Mr. Culver placed himself on top of her and covered her mouth with his hands, demanding that she be quiet. He left immediately following the incident. Ms. [the client] identified a business card which she said Respondent left at her house that night.

"Ms. [the client] testified on two later occasions Mr. Culver convinced her to perform oral sex on him. She asserted that the occasion in his office was consensual. Ms. [the client] testified that she did not report these instances to the police or file criminal charges against Respondent. She continued to allow the Respondent to represent her. Ms. [the client] was concerned that she would lose custody of her children if revealed. She was familiar with how to file a criminal complaint. Ms. [the client] further testified

that she had not filed a complaint with the Attorney Grievance Commission against Respondent, but had done so against her husband's attorney. Additionally, she was familiar with the ex parte domestic violence process.

"Ms. [the client] testified that she previously denied committing adultery under oath; she did, in fact, have sexual relations with Mr. McCormick and Respondent while married. Ms. [the client] claimed that she was unaware that they were acts of adultery while she was separated from her husband. She testified she was faithful to her husband while they lived together. Moreover, Ms. [the client] testified that, when asked about any such relationships, she took the Fifth Amendment on advice of counsel.

"The [client and husband]'s divorce case was tried in 1994. Ms. [the client] wanted to appeal that decision. Mr. Culver advised her that he would handle the appeal for a fee of $5,000.00, plus the advance payment of $1,500.00 for costs. Ms. [the client] paid the appeal fee and costs to Mr. Culver by two checks dated August 23 and September 19, 1994.

"After Ms. [the client] paid Mr. Culver to represent her in her appeal, Mr. Culver filed the appeal, then withdrew from representing her, contending Ms. [the client] owed additional fees. Mr. Culver did not return the fee paid for the appeal and did not file an appeal brief on her behalf. The Court of Special [sic] Appeals dismissed the appeal after appellant failed to file a brief.

"Susan Butzner testified that she accompanied Ms. [the client] to the master's hearing on September 9, 1993, and to the meeting with Mr. Culver that same evening. She testified that Mr. Culver was acting very unprofessional and possessive of Ms. [the client] in front of his friends and that he was getting very close to her. It appeared to Ms. Butzner that Mr. Culver had been drinking alcohol before he arrived at Bahama Mama's. She confirmed that Mr. Culver never produced the papers for Ms. [the client] to sign and that he eventually left. Ms. Butzner took Ms. [the client] home. She observed Mr. Culver in his automobile parked on the block where Ms. [the client] lived. When she

got home, Ms. Butzner called Ms. [the client] to see if Mr. Culver had come to her house. Ms. [the client] confirmed to Ms. Butzner that Mr. Culver was there in her house. At that time, Ms. Butzner and Ms. [the client] worked together. The day after the rape, Ms. [the client] was crying and told Ms. Butzner that Mr. Culver had tried to kiss her. After a few weeks, Ms. [the client] confided to Ms. Butzner that Mr. Culver in fact had forced her to have intercourse.

"Matt R. Ballenger represented Ms. [the client] in her civil suit against Mr. Culver for legal malpractice and for the coercive and forcible sexual contact. Mr. Ballenger sent Respondent a letter notifying Respondent that he intended to bring a claim against him for these matters. Mr. Culver filed suit against Ms. [the client] for defamation. Mr. Ballenger represented Ms. [the client] in defense of that suit. Mr. Ballenger described his efforts to depose Mr. Culver in connection with that suit. Mr. Culver avoided answering discovery and did not appear for his deposition. Eventually, Mr. Culver voluntarily dismissed the suit against Ms. [the client].

"Later, Mr. Ballenger filed suit against Mr. Culver on behalf of Ms. [the client]. Again, Mr. Culver was served with a notice of deposition and other discovery requests. Mr. Ballenger described his efforts to take Respondent's deposition. Respondent failed to appear for the deposition on the agreed date. He was ordered to appear by a circuit court judge, and did not appear. The Respondent was aware of the court order. Resp't Ex. No. 4 at 17. The circuit court sanctioned Respondent for his actions by order of Judge Noel dated April 24, 1997. Mr. Ballenger, additionally, testified Respondent failed to appear at a pre-trial settlement conference scheduled in front of Judge Hammerman. Eventually the court entered summary judgment against Mr. Culver based on his failure to file a timely answer to the amended complaint.

"A hearing was set to determine damages. The day before the scheduled hearing, Mr. Culver filed a petition for bankruptcy in order to stay the damages hearing. Al-

though the United States Bankruptcy Court promptly remanded the matter to the circuit court for trial on damages, Respondent's action caused a delay of almost a year in bringing the matter to trial. When the new trial date came, Respondent attempted to have the case transferred to federal court for trial. The United States District Court for the District of Maryland promptly remanded the case to the state court.

"After the case was remanded by United States District Court and set in for trial, the Respondent agreed to settle the case for $60,000.00. Because of Respondent's pending bankruptcy case, the parties agreed that the settlement funds would come from Mr. Culver's father. A certificate of deposit was assigned to Mr. Ballenger and Respondent's counsel to be held in trust to pay part of the settlement amount once the bankruptcy court approved the settlement. Other settlement funds were to be held by Respondent's lawyer in his escrow account. After negotiations were complete, an agreement was signed and the settlement was approved by the bankruptcy court. Mr. Ballenger then contacted the bank to get the funds from the certificate of deposit, only to learn that the certificate of deposit had already been cashed. Furthermore, Respondent's attorney would not turn over the funds he held in escrow. After Mr. Ballenger took further efforts to enforce the settlement, including taking action against Respondent's father, Respondent finally paid $64,000.00 to settle the case.

"The Respondent, through his answers, exhibits and cross examination, denies the allegations that he violated any of the Rules of Professional Conduct.

## FINDINGS OF FACT

"The Court, after conducting a hearing in open court, finds the following facts to be proven by clear and convincing evidence:

"The Respondent was a member of the Maryland Bar since June 21, 1978.

"[The client] retained Respondent in July 1993 to represent her in connection with her divorce case, which was pending in the Circuit Court for Baltimore County. Although Respondent's advertisement promised a free initial consultation, Respondent charged her $50.00 for the meeting. Respondent did not communicate his hourly rate to Ms. [the client] in writing. During the course of his representation, he raised his rate from $125.00 to $150.00 per hour without any advanced notice to his client.

"Mr. [husband] had propounded interrogatories. At Mr. Culver's request, Ms. [the client] promptly provided all of the information Respondent needed to prepare answers to interrogatories. Nevertheless, Respondent failed to prepare the answers in time to serve Mr. [husband]'s attorney with a timely response. Mr. [husband] sought sanctions against Mrs. [the client]. In September 1993, the court entered an order awarding sanctions against Ms. [the client], dismissing her counterclaim and precluding her from introducing evidence in support of her defense. Mr. Culver was responsible for the failure to file timely answers to discovery and the entry of the sanctions order. Respondent prepared a motion to vacate the sanctions order, served answers to discovery, and succeeded in having the sanctions order vacated. He charged Ms. [the client] for the time expended to correct his own error.

"Mr. Culver continued to represent Ms. [the client]. Ms. [the client] paid him more than $23,000.00 for legal fees. When she began experiencing financial difficulties, Mr. Culver advised Ms. [the client] to apply for more credit cards and take cash advances to pay his fee. He assured her that he would assist her in having that credit card debt discharged in bankruptcy.

"A hearing before a master was held on September 9, 1993. Ms. [the client] and Susan Butzner testified at that hearing. Mr. Culver contacted her by telephone later that day and asked to meet with her that night to sign unspecified papers, which he said needed to be submitted to the court the following day. Ms. [the client] agreed to meet

Respondent that evening at a nearby restaurant, Bahama Mama's.

"On the evening of September 9, 1993, Ms. [the client], along with Ms. Butzner, went to Bahama Mama's to meet Respondent so that Ms. [the client] could sign the papers. Mr. Culver arrived with some friends, but did not have the papers. Ms. [the client] repeatedly asked to see the papers, but Respondent never produced them. Mr. Culver left, and when he did not return, Ms. [the client] and Ms. Butzner left the restaurant.

"Ms. Butzner drove Ms. [the client] home. After leaving Ms. [the client]'s house, she saw Mr. Culver in his car near the house. Later that evening, Ms. Butzner [sic] called Ms. [the client] and was told Mr. Culver was in the house. Mr. Culver came to the house uninvited under the pretext that he wanted to inspect her house to see if she was a good housekeeper. Mr. [husband] had been claiming that Mrs. [the client] was not a good housekeeper. Ms. [the client] allowed Mr. Culver to come inside the house. At Mr. Culver's request, she showed him the children's playroom. While in the playroom, Respondent had sexual relations with Ms. [the client].

"Ms. [the client] continued to have Mr. Culver represent her because she already paid him a substantial fee and because Respondent made threats that if she did not cooperate with him and accede to his sexual demands, he would deliberately sabotage her case so that she would lose custody of her children. Ms. [the client] was emotionally upset and vulnerable at that time due to her pending divorce and her husband's threats to take the children away from her, as well as financial pressure resulting from the divorce and litigation expenses. Respondent, while maintaining a confidential relationship with Ms. [the client], exercised a degree of undue influence over and took advantage of her vulnerability, such as convincing her to perform fellatio on him on two occasions. When Ms. [the client] was deposed in her divorce case, on advice of Mr. Culver, she asserted her Fifth Amendment privilege against self-incrimination when asked

if she had committed adultery, rather than disclose that Mr. Culver or others had a sexual relationship with her.

"The [client's] divorce case was tried in July 1994. Ms. [the client] was not satisfied with the outcome and directed Respondent to file an appeal. Respondent requested payment of $5,000.00 for his flat fee plus advanced payment of costs in the amount of $1,500.00. Ms. [the client] paid those funds to Mr. Culver by checks dated August 23 and September 19, 1994. Mr. Culver deposited those funds in his operating account, although the fee was unearned and the costs had not been paid. Respondent filed the appeal, but did not file an appellant's brief. Instead, he withdrew his appearance. Respondent did not return the unearned fee for the appeal work.

"Ultimately, Ms. [the client] was unable to afford new counsel. Her appeal was dismissed by the Court of Special Appeals.

"Ms. [the client] consulted an attorney about filing a bankruptcy petition because of her financial difficulties. At a meeting with her bankruptcy attorney, Christopher Fascetta, Ms. [the client] confided to him her problems with Mr. Culver, including the sexual contact. Ms. [the client]'s attorney referred her to other counsel. Matt R. Ballenger represented her in her claims against Mr. Culver.

"After Mr. Ballenger wrote to Respondent, notifying him of Ms. [the client]'s intended claim, Respondent sued Ms. [the client], alleging defamation. Respondent unreasonably failed to respond to discovery and failed to make himself available to be deposed. As a result, Mr. Ballenger sought sanctions against the Respondent. Later, Respondent voluntarily dismissed that suit.

"Mr. Ballenger later filed a complaint on Ms. [the client]'s behalf, against Respondent. Again, Respondent engaged in a pattern of behavior to avoid responding to discovery. Despite motions for sanctions and court orders, Respondent never was deposed in that case. Ultimately, the court entered a summary judgment order establishing Respon-

dent's liability, and the case was scheduled for a hearing on damages.

"Respondent continued to defend himself in the case by obstruction and delay, which exceeded the normal bounds of aggressive counseling and defense. He filed a bankruptcy petition the day before the scheduled trial date so that the hearing on damages would be stayed. The bankruptcy court promptly returned the case to state court, but on the day before the rescheduled hearing, Respondent attempted to have the case transferred to federal court. Judge Davis returned the case to state court, finding that Respondent waited too long to request federal jurisdiction.

"Unfortunately, the civil case settled based on Respondent's assurances that funds would be paid from a certificate of deposit in his father's name as well as other funds his lawyer held in escrow. Even after the settlement was approved by the bankruptcy court, no settlement funds were disbursed. In fact, even though the certificate of deposit had been assigned to Mr. Ballenger and Respondent's counsel, to be held in trust, the certificate was cashed and no funds were given to Ms. [the client]. Mr. Ballenger had to take further action to collect the funds. Respondent attempted to have the settlement amount drastically reduced by the bankruptcy court. Judge Schneider dismissed Respondent's bankruptcy case, finding that Respondent used the bankruptcy court to delay and evade paying Ms. [the client].

### CONCLUSIONS OF LAW

"Rule 1.2(d) of the Maryland Rules of Professional Conduct states:

> (d) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make

a good faith effort to determine the validity, scope, meaning or application of the law.

"When Ms. [the client] was experiencing financial difficulties and had no resources to pay Respondent, he advised her to obtain new credit cards and to take cash advances on those accounts to pay Respondent's fees. Respondent advised her that she would not have to repay those funds because he would represent her to have those debts discharged in bankruptcy. By advising his client to obtain loans with the intention of having the debts discharged in bankruptcy, Respondent counseled Ms. [the client] to commit a fraudulent act. By giving Ms. [the client] an application for a 'Law Card' credit card to pay his fee, he assisted her in committing a fraudulent act. By this conduct Respondent violated Rule 1.2(d) of the Maryland Rules of Professional Conduct.

"Rule 1.3 of the Maryland Rules of Professional Conduct requires a lawyer to 'act with reasonable diligence and promptness in representing a client.' Respondent failed to submit timely answers to interrogatories in Ms. [the client]'s divorce case, resulting in an order entered against her imposing sanctions. Respondent also lacked due diligence by failing to respond to the Motion for Sanctions. Ms. [the client] had provided Respondent with the necessary information to respond to discovery. By his lack of diligence in submitting answers to discovery and failing to oppose the Motion for Sanctions in Ms. [the client]'s divorce case, Respondent violated Rule 1.3 of the Maryland Rules of Professional Conduct although no prejudice resulted to Ms. [the client] from this action.

"Rule 1.5(a) of the Maryland Rules of Professional Conduct requires that a lawyer's fee be reasonable. Rule 1.5(b) states:

(b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.

"Respondent charged a fee to Ms. [the client] for his initial consultation after advertising that his initial consultations were free. Respondent also charged Ms. [the client] $625.00 for time expended to respond to discovery motions which were required solely because of Respondent's lack of diligence in preparing answers to discovery. Those charges were unreasonable and violated Rule 1.5(a) of the Maryland Rules of Professional Conduct.

"Respondent's engagement letter and retainer did not specify his hourly rate. His first bill did not specify the time expended so it was impossible for Ms. [the client] to determine Respondent's hourly rate. Respondent's November 1993 invoice indicates that he initially billed Ms. [the client] at the rate of $125.00 per hour. Invoices beginning in January 1994 reflect a rate of $150.00 per hour. Respondent never notified Ms. [the client] of his intent to increase his billing rate. That failure to inform the client of a change in the terms of his fee violated Rule 1.5(b) of the Maryland Rules of Professional Conduct.

"Rule 1.7(b) of the Maryland Rules of Professional Conduct states:

> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
>
> (2) the client consents after consultation.

"Respondent allowed his own personal interests to interfere substantially with his representation of Ms. [the client]. Respondent placed his interests in continuing to be paid for his representation above Ms. [the client]'s interests when he advised her to obtain cash advances on credit cards to pay her fee with the intent to have the credit card debt discharged in bankruptcy. Respondent placed his personal interests above those of Ms. [the client] when he had sexual intercourse with her and then later convinced her to per-

form other sex acts. Ms. [the client] was in an unstable emotional state due to her pending divorce litigation and Respondent took advantage of her situation for his own personal interest. By these actions, Respondent violated Rule 1.7(b) of the Maryland Rules of Professional Conduct.

"Rule 1.15(a) of the Maryland Rules of Professional Conduct states:

> (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to [Title 16, Chapter 600] of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

"Respondent received from Ms. [the client] two checks to cover his fee and the related costs for the appeal of her divorce case in the amount of $6,500.00. Respondent's billing records demonstrate that Respondent applied some of the funds towards other fees and did not place them into his escrow account. Rule 1.15(a) requires Ms. [the client]'s funds to be held in the escrow account until Respondent had earned the fee and until the funds for costs were expended. Respondent never earned the fee for handling the appeal. He filed the notice of appeal, then withdrew from the case without ever filing an appellate brief. The appeal was subsequently dismissed. Respondent violated Rule 1.15(a) of the Maryland Rules of Professional Conduct by failing to hold these funds in trust.

"Rule 3.1 of the Maryland Rules of Professional Conduct states:

> A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or

reversal of existing law. A lawyer may nevertheless so defend the proceeding as to require that every element of the moving party's case be established.

"Rule 3.2 of the Maryland Rules of Professional Conduct states:

A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.

"Respondent engaged in a pattern of conduct of obstruction and delay to interfere in Ms. [the client]'s suit against him. He filed suit against Ms. [the client], alleging defamation, then failed to file written answers to discovery and evaded attempts to be deposed. Respondent eventually voluntarily dismissed that suit. After Ms. [the client] filed suit against Respondent, he filed a bankruptcy petition on the eve of the damages hearing in order to stay the hearing. After the stay was lifted and a new hearing date was set, Respondent had the matter removed to the United States District Court. That court returned the case to the state court, finding that Respondent's request was not timely. Subsequently, Respondent attempted to have the settlement with Ms. [the client] dramatically reduced by the bankruptcy court, even though the parties had arranged for the settlement to be paid from other sources. Judge Schneider of the United States Bankruptcy Court eventually dismissed Respondent's bankruptcy case for reasons stated in Pet'r Ex. No. 21. The Respondent exceeded the bounds of normal aggressive lawyering and by his conduct, violated Rules 3.1 and 3.2 of the Maryland Rules of Professional Conduct.

"Rule 3.4(d) of the Maryland Rules of Professional Conduct states that a lawyer shall not:

(d) in pretrial procedure, make a frivolous discovery request or fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party;

"Respondent did not make a diligent effort to respond to discovery in Ms. [the client]'s divorce case. In the subse-

quent civil actions between Respondent and Ms. [the client], Respondent failed to respond to discovery requests, defied a court order and repeatedly avoided being deposed. Respondent's conduct violated Rule 3.4(d) of the Maryland Rules of Professional Conduct.

"Rule 8.4(b) of the Maryland Rules of Professional Conduct makes it professional misconduct for a lawyer to 'commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.' The Court is not convinced by clear and convincing evidence Respondent raped Ms. [the client] at her home on September 9, 1993. However, the Court is convinced by clear and convincing evidence the Respondent engaged in sexual intercourse with Ms. [the client] and, as a result, actively participated in adulterous conduct in violation of Article 27, section 3 of the Annotated Code of Maryland. Respondent's participation in criminal conduct,[3] under these circumstances, reflects adversely on his fitness as a lawyer thereby violating Rule 8.4(b) of the Maryland Rules of Professional Conduct.

---

[3] This court recognizes that adultery is a misdemeanor punishable by fine only.

"Rule 8.4(c) proscribes 'conduct involving dishonesty, fraud, deceit or misrepresentation.' Respondent's conduct throughout his representation of Ms. [the client] and in the subsequent civil litigation was fraught with dishonesty. Respondent dishonestly charged Ms. [the client] for his initial consultation after advertising free initial consultations. He raised his hourly rate without informing her. Respondent counseled and assisted Ms. [the client] in obtaining cash advances which she had no means to repay and offered to assist her in having the debts discharged in bankruptcy. Respondent dishonestly misused the bankruptcy process to interfere in Ms. [the client]'s efforts to adjudicate her claim against him. After agreeing to a settlement amount, Respondent used dishonest means to attempt to avoid payment. For example, the certificate of deposit in Respon-

dent's father's name that was assigned to Ms. [the client] was worthless because the funds had already been withdrawn despite the assignment. Respondent's pattern of conduct violated Rule 8.4(c) of the Maryland Rules of Professional Conduct.

"Rule 8.4(d) provides it is professional misconduct for a lawyer to: 'engage in conduct that is prejudicial to the administration of justice.' Respondent engaged in outrageous conduct while entering into a pattern of sexual conduct with Ms. [the client] during his representation of her. This required her to take the Fifth Amendment when questioned about any relationships, resulting in serious potential damage to her divorce proceedings and, therefore, compromised the attorney-client relationship. *AGC v. Goldsborough, Jr.,* 330 Md. 342, 624 A.2d 503 (1993). Further, Respondent failed to be deposed or respond to discovery, defied a court order and misused the federal court and bankruptcy court to interfere in Ms. [the client]'s case. His conduct was prejudicial to the administration of justice and Respondent violated Rule 8.4(d) of the Maryland Rules of Professional Conduct."

Bar Counsel and respondent except to the finding of fact that the client, during the deposition in her divorce case and on advice of respondent, asserted her Fifth Amendment privilege against self-incrimination when asked if she had committed adultery, rather than disclose that she had a sexual relationship with respondent or others. Respondent excepts to the hearing judge's conclusions of law that respondent's conduct violated Rules 1.2(d), 1.3, 1.5(a) and (b), 1.15(a), 3.1, 3.2, 3.4(d), and 8.4(b) and (c).

## II.

This Court has original jurisdiction over attorney disciplinary proceedings. *See Attorney Grievance Comm'n v. Harris,* 371 Md. 510, 539, 810 A.2d 457, 474 (2002). In the exercise of our obligation, we conduct an independent review of the record, accepting the hearing judge's findings of fact

unless clearly erroneous. *See Attorney Grievance Comm'n v. Garfield,* 369 Md. 85, 97, 797 A.2d 757, 763–64 (2002). The factual findings of the hearing judge will not be disturbed if they are based on clear and convincing evidence. *See* Md. Rule 16–757(b) (providing that Bar Counsel has burden of establishing averments of the petition by clear and convincing evidence); *Attorney Grievance Comm'n v. Monfried,* 368 Md. 373, 388, 794 A.2d 92, 100 (2002). We consider the hearing judge's proposed conclusions of law *de novo. See Attorney Grievance Comm'n v. McLaughlin,* 372 Md. 467, 493, 813 A.2d 1145, 1160 (2002).

### A. Rule 1.7 Conflict of Interest & Rule 8.4 Misconduct

██ The hearing judge concluded that respondent violated Rule 1.7(b) (Conflict of interest) and Rules 8.4(b) and (d) (Misconduct) when he engaged in sexual relations with his client. Although respondent does not except to the hearing judge's conclusions that he violated Rules 1.7(b) and 8.4(d), respondent describes all of the sexual conduct between the client and himself as "consensual sex." [11]

After hearing all of the evidence, the hearing judge concluded unequivocally that the sexual conduct was not consensual. The hearing judge noted that the client was in an unstable emotional state as a result of her pending divorce litigation and that respondent took advantage of her for his personal interest. Respondent's conduct was egregious—he made threats to the client that if she did not accede to his sexual demands, he would deliberately sabotage her case so that she would lose custody of her children. We agree with the hearing judge's conclusions that, for purposes of Rules 1.7(b)

---

11. Even *if* we agreed with respondent, which we do not, the client's "consent" to a sexual relationship would not fit within the exception to Rule 1.7 because the commentary indicates that if the representation would be materially limited by the relationship, any client consent after the consultation would be ineffective. As we explain *infra,* respondent's representation in this domestic relations case, involving child custody, alimony, distribution of marital property, and divorce grounds, inevitably would be materially limited by the relationship.

and 8.4(b) and (d), the sexual conduct was not consensual in nature because, under the circumstances, it was exploitative and coercive.[12]

In 2002, the American Bar Association Commission on Evaluation of the Rules of Professional Conduct (Ethics 2000 Commission) added new paragraph (j) to Model Rule of Professional Conduct 1.8, a bright-line rule which prohibits a lawyer from engaging in "sexual relations with a client unless a consensual sexual relationship existed between them when the client-lawyer relationship commenced." Before this revision to the Rule, the Model Rules did not contain an explicit ban on lawyer-client sexual relationships. The comment to the Rule notes that because the relationship between the attorney and client is almost always unequal, a sexual relationship between the attorney and client can involve exploitation of the lawyer's fiduciary role, thereby violating the attorney's ethical duty not to use the trust of the client to the client's disadvantage. *See* Center for Professional Responsibility, American Bar Association, *Annotated Model Rules of Professional Conduct* R. 1.8(j) cmt. 17, at 145 (2003).

The American Bar Association, in Formal Ethics Opinion No. 92–364 (1992) disapproved of sexual relationships between attorneys and clients, concluding as follows:

"A sexual relationship between lawyer and client may involve unfair exploitation of the lawyer's fiduciary position, and/or significantly impair a lawyer's ability to represent the client competently, and therefore may violate both the Model Rules of Professional Conduct and the Model Code of Professional Responsibility.... First, because of the dependence that so often characterizes the attorney-client relationship, there is a significant possibility that the sexual relationship will have resulted from exploitation of the lawyer's dominant position and influence and, thus, breached the lawyer's fiduciary obligations to the client. Second, a

---

**12.** Whether the conduct here would be regarded as non-consensual for the purpose of sex offense laws is not before us and we express no opinion on that issue.

sexual relationship with a client may affect the independence of the lawyer's judgment. Third, the lawyer's engaging in a sexual relationship with a client may create a prohibited conflict between the interests of the lawyer and those of the client. Fourth, a non-professional, yet emotionally charged, relationship between attorney and client may result in confidences being imparted in circumstances where the attorney-client privilege is not available, yet would have been, absent the personal relationship."

Many states have adopted rules addressing lawyer-client sexual relationships.[13] Other states, *see, e.g.,* Michigan and Vermont, have rejected proposed amendments to existing rules, reasoning that amendments were unnecessary because the rules as written covered such contact sufficiently. Courts in many of the jurisdictions without an express rule prohibiting attorney-client sexual relations have found that attorney-client sexual relations violate existing rules.[14]

Maryland falls within those states that declined to amend the black letter of the Rules of Professional Conduct or to

---

**13.** *See, e.g.,* Arizona, Ariz. Rules of Prof'l Conduct R. 1.8(j) (amended 2003); California, Cal. Rules of Prof'l Conduct R. 3–120 (2002); Delaware, Del. Rules of Prof'l Conduct R. 1.8(j) (2004); Florida, Fla. Rules of Prof'l Conduct R. 4–8.4(i) (2004); Iowa, Iowa Code of Prof'l Responsibility DR 5–101(B) (2004); Minnesota, Minn. Rules of Prof'l Conduct R. 1.8(k) (2004); Montana, Mont. Rules of Prof'l Conduct R. 1.8(j) (revised effective April 1, 2004); New York, N.Y.Code of Prof'l Responsibility DR 5–111 (2003); North Carolina, N.C. Rules of Prof'l Conduct R. 1.19 (2004); Oregon, Or.Code of Prof'l Responsibility DR 5–110 (2004); Utah, Utah Rules of Prof'l Conduct R. 8.4(g) (2004); Washington, Wash. Rules of Prof'l Conduct R. 1.8(k) (2004); West Virginia, W. Va. Rules of Prof'l Conduct R. 8.4(g) (2004); and Wisconsin, Wis. Rules of Prof'l Conduct R. 1.8(k) (2004).

**14.** *See, e.g., People v. Barr,* 929 P.2d 1325, 1326 (Colo.1996); *Matter of Lewis,* 262 Ga. 37, 415 S.E.2d 173, 174–75 (1992); *In re Rinella,* 175 Ill.2d 504, 222 Ill.Dec. 375, 677 N.E.2d 909, 915 (1997); *Matter of Grimm,* 674 N.E.2d 551, 554 (Ind.1996); Kan. Bar Ass'n Ethics Op. No. 94–13 (1995); *Kentucky Bar Ass'n v. Meredith,* 752 S.W.2d 786, 788 (Ky.1988); *In re Ashy,* 721 So.2d 859, 867–68 (La.1998); *Drucker's Case,* 133 N.H. 326, 577 A.2d 1198, 1202 (1990); *Matter of Liebowitz,* 104 N.J. 175, 516 A.2d 246, 247 (1985); *In re DiSandro,* 680 A.2d 73, 75 (R.I.1996); *Matter of Bilbro,* 324 S.C. 132, 478 S.E.2d 253, 255 (1996); and *In re Bergren,* 455 N.W.2d 856, 857 (S.D.1990).

.

establish specific guidelines for sexual conduct of attorneys. Although not stated explicitly in the black letter, Maryland Rule 1.7(b), Conflict of Interest, does prohibit sexual relationships between attorneys and their clients under certain circumstances. The comment to the Rule, added effective July 1, 1997, provides in relevant part as follows:

"A sexual relationship with a client, whether or not in violation of criminal law, will create an impermissible conflict between the interests of the client and those of the lawyer if (1) the representation of the client would be materially limited by the sexual relationship and (2) it is unreasonable for the lawyer to believe otherwise. Under those circumstances, client consent after consultation is ineffective. See also Rule 8.4."

Rule 1.7 cmt. Similarly, the comment to Rule 8.4 makes clear that sexual misconduct may violate paragraph (d) of the Rule as constituting conduct prejudicial to the administration of justice. The comment to the Rule provides in relevant part as follows:

"Sexual misconduct or sexual harassment involving colleagues, clients, or co-workers may violate paragraph (d). This could occur, for example, where coercion or undue influence is used to obtain sexual favor in exploitation of these relationships."

Rule 8.4 cmt.[15]

Although the Maryland Rules of Professional Conduct do not address explicitly respondent's conduct, we hold that

---

15. The commentary to the Maryland Rules of Professional Conduct 1.7 and 8.4 was revised in 1996. Much of the impetus for the changes came from a concern of the Maryland Trial Lawyers Association (MTLA), in 1994–1995, that there was no Maryland Rule of Professional Conduct dealing explicitly with the issue of attorney-client sexual relations. At that time, a few states, such as California, Oregon, and New York, had adopted black letter rules addressing such conduct. Representatives and members of the MTLA, the Maryland Joint Committee on Gender Equality, and the Attorney Grievance Commission of Maryland were present and commented at the Court of Appeals December 9, 1996 hearing on the 133rd Report of the Rules Committee, when the Court considered whether to adopt a new rule covering attorney-client sexual

respondent's conduct violated Rules 1.7 and 8.4. *See In re Ashy,* 721 So.2d 859, 864 (La.1998) (stating that while Louisiana Rules of Professional Conduct do not specifically address sexual relationships between attorneys and clients, such conduct violates Rules 1.7 and 8.4); *In the Matter of Piatt,* 191 Ariz. 24, 951 P.2d 889, 891 (1997) (holding that unwanted sexual advances to client by attorney violated Arizona Rule of Professional Conduct 1.7(b)); *Matter of Grimm,* 674 N.E.2d 551, 554 (Ind.1996) (holding that attorney's sexual involvement with his client violated Indiana Rule of Professional Conduct 1.7(b)). The hearing judge found that respondent made threats to the client that if she did not cooperate with him and accede to his sexual demands, he would deliberately sabotage her case so that she would lose custody of her children. Respondent's conduct goes to the very core of legal representation and is egregious.

Even though states have adopted different approaches to the issue of sexual relations between attorneys and clients,[16]

---

relations. The Court declined to adopt a new rule, reasoning that it was unnecessary because Rules 1.7 and 8.4 covered such conduct.

**16.** The debate within the legal community as to the propriety of an attorney engaging in sexual conduct with a client and the enactment of express rules to regulate such conduct is ongoing. *See, e.g.,* A. Awad, *Attorney–Client Sexual Relations,* 22 J. Legal. Prof. 131 (1998) (surveying the jurisdictions on rules regulating attorney-client sexual relations and arguing for an express rule prohibiting such conduct); A. Davis & J. Grimaldi, *Sexual Confusion: Attorney–Client Sex and the Need for a Clear Ethical Rule,* 7 Notre Dame J.L. Ethics & Pub. Pol'y 57 (1993) (stressing the need for a specific rule prohibiting attorney-client sexual relations); N. Goldberg, *Sex and the Attorney–Client Relationship: An Argument for a Prophylactic Rule,* 26 Akron L.Rev. 45 (1992) (advocating an express prohibition of sexual relationship between an attorney and client); Y. Levy, *Attorneys, Clients and Sex: Conflicting Interests in the California Rule,* 5 Geo. J. Legal Ethics 649 (1992) (proposing prohibition of attorney-client sex in divorce cases, custody cases, criminal cases, and *pro bono* cases); M. Livingston, *When Libido Subverts Credo: Regulation of Attorney–Client Sexual Relations,* 62 Fordham L.Rev. 5 (1993) (advocating *per se* rule prohibiting attorney-client sexual relationships); M. McQueen, *Regulating Attorney–Client Sex: The Need For An Express Rule,* 29 Gonz. L.Rev. 405 (1993–1994) (supporting a bright-line rule to protect clients against coercive sexual advances from their attorneys); L. Mischler, *Reconciling Rapture, Representation,*

it is uniformly held that unwanted sexual advances, usually considered exploitation, by an attorney to a client violate the Rules of Professional Conduct. Unquestionably, demanding sexual contact with a client and conditioning legal representation on sexual contact is exploitative and violative of the rules.

The hearing judge found that respondent's adulterous conduct violated Rules 8.4(b) and (d). Respondent does not except to the judge's finding that he violated 8.4(d) but argues only that the appropriate sanction for engaging in consensual sexual conduct with a client should be a reprimand. Respondent excepts to the conclusion that he violated 8.4(b), arguing that because adultery is a misdemeanor, punishable only by a $10.00 fine, committing the "crime" of adultery cannot reflect adversely on his, or any person's, fitness as a lawyer.

Unlike many other states, *see, e.g.,* Connecticut, adultery is still a crime in Maryland. *See* Md.Code (2002, 2003 Cum. Supp.) § 10–501 of the Criminal Law Article. Originally, Rule 8.4(b) applied to offenses of "moral turpitude" but is not so limited today.[17] The comment to Rule 8.4 reads in relevant part as follows:

> "Many kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses involving fraud and the offense of willful failure to file an income tax return. However, some kinds of offense carry no such implication. Traditionally, the distinction was drawn in terms of offenses involving 'moral turpitude.' That concept can be construed to include offenses concerning some matters of personal

---

*and Responsibility: An Argument Against Per Se Bans on Attorney–Client Sex,* 10 Geo. J. Legal Ethics 209 (1997) (arguing that a ban on sexual relations is an unconstitutional intrusion on attorney's and client's right to privacy).

ABA Model Rule 1.8(j) has been criticized as over-inclusive and at the same time under-inclusive. *See, e.g.,* F. Vincent, *Regulating Intimacy of Lawyers: Why is it Needed and How Should it be Approached?,* 33 U. Tol. L.Rev. 645, 678–80 (2002); C. Wolfram, *Ethics 2000 and Conflicts of Interest: The More Things Change....,* 70 Tenn. L.Rev. 27, 55 (2002).

**17.** Former Disciplinary Rule of the Code of Professional Responsibility 1–102(A) provided that "A lawyer shall not ... [e]ngage in illegal conduct involving moral turpitude."

morality, such as adultery and comparable offenses, that have no specific connection to fitness for the practice of law. Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, or breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation."

We need not decide whether committing such a "criminal act," in and of itself and unconnected to the practice of law, in the context of contemporary moral values, may or may not reflect adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects because in this case, respondent's conduct reflected adversely on his fitness to practice law. The sexual conduct was exploitative and coercive, and that alone reflects adversely on his fitness to practice law. In addition, the adulterous conduct arose during respondent's representation of the client in a divorce matter. Finally, the conduct was in violation of Rule 8.4(d) and was prejudicial to the administration of justice.

Respondent's engaging in sexual relations with his domestic relations client was an inherent conflict of interest in violation of Rule 1.7(b). Many states have held that engaging in sexual intercourse with a client while representing the client in a contested divorce and custody action is a *per se* violation of the Rules of Professional Conduct, even if the sexual conduct is consensual. *See, e.g., People v. Zeilinger,* 814 P.2d 808, 810 (Colo.1991) (holding that attorney's sexual relationship with divorce client created an impermissible conflict of interest due to danger, among others, that attorney may be called as a witness and inflict harm on the client); *Matter of Grimm,* 674 N.E.2d 551, 554–55 (Ind.1996) (finding that attorney who engaged in a sexual relationship with his divorce client violated Rule 1.7(b) and should have known that the relationship

could have negatively impacted child custody issues); *In re Halverson,* 140 Wash.2d 475, 998 P.2d 833, 840 (2000) (same).

The case of *Matter of DiPippo,* 678 A.2d 454 (R.I.1996), is illustrative of the view other courts have taken with respect to sexual relations between an attorney and client when the representation is in a matrimonial matter. In that case, the lawyer was retained to represent a client in a divorce action involving custody of and support for the minor children of the marriage, and distribution of the marital assets. During the course of the legal representation, a consensual sexual relationship developed between the lawyer and the client. While the sexual relationship was ongoing, the client applied for credit to purchase a home, stating, falsely, that she was employed by her attorney. The attorney falsely verified her employment to the credit union. Rhode Island is one of the states that has no specific prohibition contained within the Rules of Professional Conduct regarding sexual activities between attorneys and their clients. The Rhode Island Supreme Court concluded that the lawyer violated Rhode Island Rule 1.7(b), the professional conduct rule worded the same as in Maryland, reasoning as follows:

"Any competent attorney practicing in the area of domestic-relations law must be aware that the sexual conduct of a divorce client may have significant bearing on that client's ability to secure child custody and in the determination of the distribution of marital assets. G.L.1956 § 15–5–3.1 and § 15–5–16. The attorney who engages in sexual relations with his or her divorce client jeopardizes the client's rights. The lawyer's own interest in maintaining the sexual relationship creates an inherent conflict with the proper representation of the client."

*Id.* at 456. The court announced a bright-line rule condemning such representation, stating as follows:

"An attorney who desires to engage in sexual relations with a divorce client, when issues of child custody, support, and distribution of marital assets are at stake, must choose

between furthering an intimate relationship or acting as a lawyer for the client. It is impermissible to do both." *Id. See also Matter of Lewis*, 262 Ga. 37, 415 S.E.2d 173, 175 (1992) (stating that in the context of divorce and custody actions, sexual intercourse with a client is a *per se* violation of the disciplinary rules, concluding that "[e]very lawyer must know that an extramarital relationship can jeopardize every aspect of a client's matrimonial case—extending to forfeiture of alimony, loss of custody, and denial of attorney fees").

We agree with those courts that have held that an attorney who engages in sexual relations with a client, whether consensual or not, while representing that client in a matrimonial matter, jeopardizes the client's rights and engages in an inherent conflict of interest in violation of Rule 1.7(b). When divorce is in issue, the lawyer who engages in sexual intercourse with the client may be supplying the client's spouse with grounds for an immediate divorce and may interfere with any possibility of a reconciliation. *See* Md.Code (1984, 1999 Repl.Vol., 2003 Cum.Supp.) § 7–103 of the Family Law Article;[18] *see also Robinson v. Robinson*, 328 Md. 507, 516, 615 A.2d 1190, 1194 (1992) (quoting *Davis v. Davis*, 280 Md. 119, 127, 372 A.2d 231, 235 (1977), "whereas the fact of adultery may be a relevant consideration in child custody awards, no presumption of unfitness on the part of the adulterous parent arises from it; rather it should be weighed, along with all other pertinent factors, only insofar as it affects the child's welfare"); Annot., *Custodial Parent's Sexual Relations with Third Person as Justifying Modification of Child Custody Order*, 100 A.L.R.3d 625 (1980 & 2003 Supp.). In a contested divorce matter, such conduct makes the lawyer a potential witness in the case, creating an intolerable circum-

---

18. The client may seek an absolute divorce on adultery grounds, thereby eliminating the statutory waiting period for divorce. *See* Md.Code (1984, 1999 Repl.Vol., 2003 Cum.Supp.) § 7–103 of the Family Law Article. Absent an agreement between the parties, or statutory grounds alleviating the waiting period, the parties must live separate and apart for two years without interruption before the divorce may be granted. *See id.*

stance. *See People v. Zeilinger,* 814 P.2d 808, 810 (Colo.1991) (noting significant danger in divorce action that even if sexual acts were consensual, attorney may become a witness and also inflict harm to client when property division or custody is at issue). In sum, in a domestic relations matter, when the grounds for divorce, child custody, alimony, or the distribution of marital assets are at issue, the attorney knows or should know that a sexual relationship with the client has the potential to jeopardize the client's case. In such circumstances, an attorney who engages in sexual relations with the client violates Rule 1.7(b).

### B. Rule 1.2(d) Scope of Representation

██ The hearing judge concluded that respondent violated Rule 1.2(d) in two ways: (1) by advising the client to obtain credit card loans with the intent of having the debt discharged in bankruptcy, thereby advising her to commit a fraudulent act, and (2) by giving her an application for a credit card, thereby assisting her in committing a fraudulent act. Respondent excepts to this conclusion of law.

 Respondent argues that an attorney does not engage in misconduct by providing advice to a client concerning the scope of the bankruptcy laws and in advising a client regarding lawful means to obtain money to pay counsel fees. We agree. However, respondent's conduct falls outside the range of providing advice about the law or providing lawful counsel as to how to obtain money and does not fall within the permissive scope of the rule which provides that a lawyer "may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law." A lawyer may not assist the client in breaking the law. *See, e.g., In re DeRose,* 55 P.3d 126 (Colo.2002); *Office of Disciplinary Counsel v. Klein,* 61 Haw. 334, 603 P.2d 562 (1979).

██ In Maryland, it is fraudulent as to both present and future creditors to enter into an obligation with the intent or belief that the debt will be beyond one's ability to pay when it

matures. *See* Md.Code (1975, 2000 Repl.Vol., 2003 Cum. Supp.) § 15–206 of the Commercial Law Article.[19] The hearing judge found as a fact that the client's financial difficulties were known to respondent, that additional debt would be beyond her ability to repay, and the bankruptcy discussions were in the context of present intent to avoid repaying the debt. Respondent informed her of the means by which she could obtain a cash advance from one or more creditors to pay his legal fees and how she could avoid repaying those creditors. Respondent's conduct was fraudulent and in violation of Rule 1.2(d). *See In re De Pamphilis*, 30 N.J. 470, 153 A.2d 680 (1959) (attorney engaged in unethical conduct by recommending that clients transfer property for the purpose of hiding assets and defrauding creditors); *Matter of Kenyon*, 327 S.C. 307, 491 S.E.2d 252 (1997) (attorney violated Rule 1.2(d) by conveying property to assist a client in avoiding creditors). Respondent's exception is overruled.

## C. Rule 1.3 Diligence

The hearing judge concluded that respondent violated Rule 1.3 by failing to timely answer interrogatories in the client's divorce case, resulting in an order entered against her imposing sanctions. Respondent also lacked due diligence by failing to respond to the Motion for Sanctions.

Respondent argues that he did not violate Rule 1.3, or in the alternative that the violation was *de minimus,* because he later filed the answers to the interrogatories, no exceptions were taken, the court vacated the sanction, and the client was not prejudiced. That the sanctions were ultimately lifted is immaterial to respondent's lack of diligence regarding discovery. Respondent violated Rule 1.3. The exception is overruled.

---

19. Maryland Code (1975, 2000 Repl.Vol., 2003 Cum. Supp) § 15–206 of the Commercial Law Article provides, in pertinent part, that "every obligation incurred without fair consideration when the person who . . . enters into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."

## D. Rule 1.5 Fees and Rule 1.15(a) Safekeeping Property

The hearing judge concluded that respondent violated Rule 1.5(a) by charging the client a fee after he had advertised that his initial consultation would be free, and for charging her $625.00 for the time he expended to respond to discovery motions which were required solely because of his lack of diligence.[20] The judge found respondent violated Rule 1.5(b) by failing to specify an hourly rate in the engagement letter and retainer agreement. He also found respondent violated Rule 1.15(a) by failing to hold $6,500.00 in escrow. Respondent excepts to these conclusions of law.

Respondent makes two arguments as to Rule 1.5. First, he argues that his fees related to the sanction order were proper because the order was "legally incorrect," as evidenced by it being vacated. Second, he argues that even though he did not send a letter telling the client that he was raising his hourly rate, the increase was reflected in his billing statements. He maintains that his actions did not violate Rule 1.5, or alternatively, were a *de minimus* violation of the Rule. We overrule the exception.

■ Respondent violated Rule 1.5(a). As a sanction in the divorce case, the Circuit Court precluded the client from testifying and dismissed her counterclaim. Merely because the judge vacated the sanction does not support respondent's argument that the sanction was "legally incorrect." The sanction was imposed as a direct result of respondent's failure to represent the client competently, and the client should not have to pay counsel fees to have that sanction lifted. *See Attorney Grievance Commission v. Dietz,* 331 Md. 637, 647, 629 A.2d 678, 683 (1993) (holding that "[i]nasmuch as the harm to the client as a result of [the attorney's] violations equaled or

---

**20.** Petitioner's Exhibit No. 26, respondent's November 16, 1993 billing statement to the client, reflects several charges related to discovery matters. To the extent that the client was obligated to respond to these discovery requests, respondent was entitled to charge a fee. The charges related to the sanctions were not reasonable.

exceeded the amount paid to [the attorney], the entire fee became excessive and should be refunded").

■■■ Respondent excepts to the hearing judge's conclusion that he violated Rule 1.5(b) by failing to inform the client of a change in the terms of his fee. Respondent claims that he did not violate the Rule because, even though he failed to send a letter to the client communicating the increase in the hourly rate of his fee, the rate increase was reflected in his billing statements, which the client received and paid.

Respondent violated Rule 1.5(b) by not communicating to the client his hourly rate within a reasonable time after commencing the representation. He was retained by respondent in March 1993. His engagement letter and retainer did not indicate his hourly rate and neither did his first bill. It was not until November 1993 that an invoice indicated the hourly rate of $125.00. The January 1994 invoice then reflected that respondent's rate had increased to $150.00 per hour as of December 1993. Respondent failed to communicate the rate of his fee within a reasonable time after commencing the representation of the client. This exception is overruled.

■■■ The hearing judge concluded that respondent violated Rule 1.15(a) by not placing in a trust account the $6,500.00 legal fee sent by the client to respondent to cover his legal fees for an appeal. The client sent two checks to respondent, $1,500.00 dated August 23, 1994, and $5,000.00 dated September 19, 1994. Respondent's letter to the client of November 7, 1994, states that the client's trust account balance was $3,584.17; however, respondent conceded at oral argument that he did not place the money into his escrow account. Respondent argues that he was justified in not placing the money in his trust account because the client owed him for legal work in her divorce case and because he was providing post-trial pre-appeal legal services related to her divorce case. He urges this Court to hold that there is nothing unethical when the attorney applies the funds first to the outstanding balance, second to the post-trial legal services needed, and then to the appeal.

Even if we accept respondent's argument that the client had an outstanding balance due to him for services he had performed in the divorce matter at the Circuit Court level, and also assuming *arguendo* that he had a right to use some of the money the client sent to him for the appeal to satisfy the outstanding balance, he was required to place the money in his escrow account until he had earned the fee. The appeal was subsequently dismissed. The hearing judge found that respondent never earned the fee for handling the appeal. Respondent noted the appeal and then withdrew from the case without filing an appellate brief. We point out that the money sent by the client to cover the appeal exceeded the amount due for legal work already performed by respondent.

Rule 1.15(a) requires the client's funds to be held in the escrow account until respondent had earned the fee. Respondent never earned the fee for handling the appeal. His billing records indicate that he had earned only some of the $6,500.00 when he deposited it into his operating account. As he had not earned the full amount of the funds, respondent's failure to place the money in an escrow account was conduct in violation of Rule 1.15(a). *See Attorney Grievance Comm'n v. Blum*, 373 Md. 275, 299, 818 A.2d 219, 233 (2003) (holding that attorney's failure to place unearned fees into an attorney trust account violated Rule 1.15(a)). This exception is overruled.

### E. Rule 3.1 Meritorious Claims, Rule 3.2 Expediting Litigation, and Rule 3.4(d) Fairness to Opposing Party and Counsel

The hearing judge found that respondent exceeded the bounds of normal aggressive lawyering and by his conduct violated Rules 3.1, 3.2., and 3.4(d). The hearing judge found that respondent engaged in a pattern of conduct of obstruction and delay to interfere in the client's suit against him by filing suit against the client, alleging defamation, then failing to file written answers to discovery and evading attempts to be deposed. Respondent eventually voluntarily dismissed his lawsuit. The judge concluded that this pattern of conduct violated Rules 3.1 and 3.2. He also found that respondent

violated Rule 3.4(d) by failing to respond to discovery requests and defying a court order to be deposed.

After the client filed suit against respondent, he filed a bankruptcy petition on the eve of the damages hearing in order to stay the hearing. After the stay was lifted and a new hearing date was set, respondent then had the case removed to the United States District Court. Finding that respondent's request was not timely, that court returned the case to the state court. The damages hearing was rescheduled for a date more than eight months later than the originally scheduled hearing. Subsequently, respondent attempted to have the settlement, which was reached only on the day of the damages hearing, dramatically reduced by the bankruptcy court, even though the parties had arranged for the settlement to be paid from non-bankruptcy estate funds. Judge Schneider of the United States Bankruptcy Court eventually dismissed respondent's bankruptcy case for reasons stated in Petitioner's Exhibit Number 21, set forth *infra*. Respondent's conduct, when viewed in its entirety, evidenced an intent to delay the proceedings in the client's civil suit against him and to obstruct her ability to collect the settlement which eventually was reached.

Respondent excepts to the hearing judge's conclusions of law and argues that the litigation was acrimonious and aggressive and that lawyers should be "able to push the envelope and explore the outer reaches of the law and lawyering." He maintains that he relied upon the advice of counsel that he was not required to appear at a deposition, and that "legitimate jurisdictional posturing is not professional misconduct."

The record supports the findings of fact and conclusions of law of the hearing judge. Respondent's conduct went well beyond the realm of zealous advocacy. The ruling of the Bankruptcy Judge, Judge Schneider, sums up respondent's conduct, as follows:

"This case is little more than a smoke screen. Whether it was filed in good faith or not is debatable.

* * *

[Respondent], since the filing of this case, has used the bankruptcy court as a weapon to prevent [the client] from ever reaching a resolution of her claim. And I would describe his conduct, which I have witnessed from the beginning, in the following terms, egregious, obnoxious, deceptive. The arguments he's raised have been consistently meritless in my opinion. His conduct in the entire litigation with [the client], from the failure to attend a deposition and to properly respond to the complaint in the state court at best was stupid and at worst was dishonest and disingenuous just as his arguments are today.

* * *

Why should this case be allowed to continue here? The purpose of this case isn't to reorganize anybody. The purpose of this is to hold [the client] off and to create such confusion between state and federal courts that no one knows where the next move is to be made.

* * *

I will not confirm [respondent's plan] knowing the history of the case. I will not confirm it because it is a deception practiced by the debtor upon creditors including [the client].

* * *

To consider this case further and to keep it under the protection of the United States Bankruptcy Court would be a violation of the law. It would besmirch the role of a bankruptcy court by sending a message to the public that fraudulent cases like this one can be maintained and maintained for year after year after year with no end in sight by somebody who has manipulated the law to gain an unfair advantage over other people who have acted honestly."

Pet'r Ex. No. 21, at 40–47.

The record also supports the hearing judge's findings that respondent did not respond to discovery requests. Respon-

dent's conduct cannot be justified, in any manner, as professional conduct.

To be sure, "the American lawyer's professional model is that of zeal. . . ." C. Wolfram, *Modern Legal Ethics*, § 10.3.1, Nature of the Principle of Zeal, at 578 (1986). But zeal is not boundless and some limits are acknowledged by all, although the limits are not always clear. *Id.* at 579 . *See Little v. Duncan*, 14 Md.App. 8, 15, 284 A.2d 641, 644 (1971) (stating that "[z]eal in advocacy is commendable, but zeal, even in advocacy, without bounds may be contemptuous and disruptive"); *In re Hockett*, 303 Or. 150, 734 P.2d 877, 884 (1987) (noting that "[z]ealous representation is limited by more than the criminal law"). Judge Arrie Davis, writing for the Court of Special Appeals, commented on the duty of an attorney to exercise zealous advocacy. He noted:

> "Lest there be any doubt that we favor—indeed believe an adversary system demands no less—zealous advocacy, we reiterate unequivocally that it is an advocate's duty to use legal procedure for the fullest benefit of the client's cause, but it is also a duty not to abuse legal procedure. *See* Maryland Rules of Professional Conduct, Comment to Rule 3.1."

*Reed v. Baltimore Life*, 127 Md.App. 536, 552–53, 733 A.2d 1106, 1114–15 (1999). Respondent's conduct violated Rules 3.1, 3.2, and 3.4(d) and his exceptions are overruled.

### F. Rule 8.4(c) Misconduct

The hearing judge found that respondent violated Rule 8.4(c). Respondent excepts to the hearing judge's conclusion and argues that his conduct was justified because he relied upon advice of his counsel that he need not comply with the discovery request. He also argues that the hearing judge erred in characterizing his conduct as "dishonest."

The hearing judge's conclusion that respondent acted dishonestly was not based on respondent's defiance of a court order and is amply supported by the record. Respondent's dishonesty lay at the root of many of the rule violations

discussed *supra.* For example, respondent acted dishonestly in counseling the client to take out cash advances she had no ability to repay; in failing to place trust money in an escrow account; and in misusing the bankruptcy process in an attempt to avoid the adjudication and settlement of the client's claim against him. Further, as the hearing judge noted, respondent dishonestly charged the client for his initial consultation after having advertised that initial consultations were free of charge. This exception is overruled.

Finally, we address one housekeeping matter and the exception filed by Bar Counsel and respondent. Both parties point out that the hearing judge erred in finding that, during the client's deposition in her divorce case and on advice of respondent, the client asserted her Fifth Amendment privilege against self-incrimination rather than disclose that she had committed adultery with *respondent.* The record indicates that the client was not asked if she had, in general, committed adultery, or had committed adultery with respondent. Rather, opposing counsel asked the client whether she had had sexual relations with a named individual, who was not respondent. Respondent objected to that particular question and stated that the client would exercise her Fifth Amendment right not to answer the question. We sustain the exception.

### III.

We now turn to the appropriate sanction to be imposed. Bar Counsel recommends disbarment. Respondent argues that the appropriate sanction is a reprimand or, in the alternative, a short suspension, not to exceed ninety days.

The purpose of sanctioning an attorney is to protect the public rather than to punish the errant attorney. *See Attorney Grievance Comm'n v. Powell,* 369 Md. 462, 474, 800 A.2d 782, 789 (2002). Attorney disciplinary proceedings also are aimed at deterring other attorneys from committing violations of the Rules of Professional Conduct. *Id.* at 474–75, 800 A.2d at 789. The severity of the sanction depends on the particular facts and circumstances of each case, including

consideration of any mitigating factors or aggravating factors. *See Attorney Grievance Comm'n v. Angst,* 369 Md. 404, 416–18, 800 A.2d 747, 755 (2002).

Several factors are significant in this case. Respondent's sexual conduct was not consensual. Respondent violated multiple ethical duties by engaging in sexual relations with his client. In addition, respondent engaged in conduct which violated several rules of professional behavior. In addition to the conflict of interest, he acted dishonestly, charged an excessive fee, failed to keep money in safe keeping, did not respond to discovery requests; and filed frivolous pleadings.

As aggravating factors, respondent exploited a vulnerable client. Respondent's conduct was particularly egregious because he conditioned his legal representation upon the client submitting to his sexual desires. His misconduct went to the very core of legal representation. Respondent takes no responsibility for his conduct and shows no remorse. His misconduct was significant and not, as he suggests, *de minimus.*

Respondent presents little in mitigation of his conduct. Respondent was admitted to practice in this State on June 21, 1978. At the time of his misconduct in this case, he had no prior disciplinary record. As of this date, respondent has had two prior disciplinary actions; the first was a public reprimand in 2000 for lack of diligence and communication with a client, the second occurred in 2002, when respondent received an indefinite suspension, with the right to reapply for readmission after thirty days, conditioned upon payment to the client of $3,500.00 *See Attorney Grievance Comm'n v. Culver,* 371 Md. 265, 808 A.2d 1251 (2002).

We have not had occasion to consider the appropriate sanction for conduct such as that of respondent. In *Attorney Grievance Commission v. Goldsborough,* 330 Md. 342, 624 A.2d 503 (1993), there was a finding that the attorney engaged in non-consensual sexual conduct with two female clients and a female secretary. The attorney spanked one client, kissed another client, and spanked his secretary approximately once a week for almost two years. This Court held that the

attorney engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d). In considering the appropriate sanction, we emphasized the fiduciary relationship between attorney and client and the "emotional, psychological, and social" harm inflicted by the attorney on his victims as well as the harm to the legal profession. We stated as follows:

> "The attorney-client relationship is based on trust, with the client necessarily placing total trust in the attorney and the attorney pledging to act in the client's best interest. Goldsborough, by his conduct, failed to demonstrate his recognition of, and respect for, his clients' trust.
>
> * * *
>
> [H]e abused the power that accompanied his license to practice law. When he gratified his psychological or sexual need at his clients' expense, he breached the trust indispensable to the attorney-client relationship. These acts, combined with Goldsborough's exploitative and abusive behavior toward a secretary in his law office, harmed not only his victims, but also the profession and the entire judicial system."

*Id.* at 364–65, 624 A.2d at 514. Because the Court considered the possibility that the attorney might be suffering from "a serious but treatable disorder," and thus might rehabilitate himself, Goldsborough was not disbarred. *Id.* at 366, 624 A.2d at 514. The sanction imposed by this Court was an indefinite suspension, with the right to reapply for readmission in no less than two years.

As in all attorney grievance cases, we consider each case on its merits, paying attention to the particular facts and circumstances of the individual case. *Attorney Grievance Comm'n v. Awuah,* 374 Md. 505, 526, 823 A.2d 651, 663 (2003). As the Supreme Court of Washington noted in considering the appropriate sanction for attorney sexual misconduct with a client, consideration of sanctions imposed in sexual misconduct cases from other jurisdictions is of little assistance because the range of sanctions imposed in relation to the misconduct is

highly inconsistent.[21] *See In re Halverson*, 140 Wash.2d 475, 998 P.2d 833, 847 n. 18 (2000) (comparing, for example, *"In re Lewis*, 262 Ga. 37, 415 S.E.2d 173 (1992) (three year suspension imposed where attorney commenced sexual relationship three years before being retained in divorce action even though no harm to client appeared to have resulted) *with In re McBratney*, 320 S.C. 416, 465 S.E.2d 733 (1996) (90–day suspension imposed where attorney gave domestic relations client one-half of a Valium, and had sexual relationship with her, and legal representation resulted in a less than favorable settlement)").

In this case, considering the sexual misconduct along with the other violations of the Rules of Professional Conduct, we conclude that respondent should be disbarred. We said recently in *Attorney Grievance Commission v. Awuah*, 374 Md. 505, 823 A.2d 651 (2003), that the purposes of sanctions are "to protect the public, to deter other lawyers from engaging in violations of the Maryland Rules of Professional Conduct, and to maintain the integrity of the legal profession." *Id.* at 526, 823 A.2d at 663. The purpose of the sanction is not to punish the lawyer, but to protect the public. The public is protected when the sanction imposed comports with the nature and seriousness of the violations and the intent with which they were committed. *Id.* When a lawyer intentionally

---

**21.** While state courts have imposed sanctions ranging from public reprimand to disbarment in cases of consensual sexual relations between attorney and client, those jurisdictions that have addressed attorney misconduct involving coercion or exploitation of the attorney-client relationship *consistently have imposed strong sanctions. See, e.g., In re Rinella*, 175 Ill.2d 504, 222 Ill.Dec. 375, 677 N.E.2d 909 (1997) (three-year suspension); *In re Ashy*, 721 So.2d 859 (La.1998) (two-year suspension); *Otis' Case*, 135 N.H. 612, 609 A.2d 1199 (1992) (disbar); *In re Conduct of Hassenstab*, 325 Or. 166, 934 P.2d 1110 (1997) (disbar). In circumstances where the attorney had exploited the attorney-client relationship by connecting legal services to sexual relationships, courts have imposed a range of sanctions. *See, e.g., The Florida Bar v. Bryant*, 813 So.2d 38 (Fla.2002) (one-year suspension); *In re Touchet*, 753 So.2d 820 (La.2000) (disbar); *Cleveland Bar Ass'n v. Feneli*, 86 Ohio St.3d 102, 712 N.E.2d 119 (1999) (eighteen-month suspension with six months stayed); *In re Bergren*, 455 N.W.2d 856 (S.D.1990) (one-year suspension).

exploits the attorney-client relationship for his or her own benefit, it reflects on the lawyer's fitness to practice law. Disbarment is generally the appropriate sanction.

 Respondent engaged in multiple instances of misconduct. Each standing alone might warrant a sanction less than disbarment, but considering all of the circumstances, disbarment is the appropriate sanction. A lawyer is required to exercise his or her independent legal judgment and to put forth his or her best legal efforts on behalf of the client, and except in very limited circumstances, without any conflict of interest. An attorney who exploits a client by threatening to withdraw from the case if the client does not engage in sexual contact commits a most serious ethical violation. As we have indicated, sexual relations with a client in a contested domestic case pose a significant risk of damaging the client's interest. Respondent abused his relationship with his client, destroyed the trust clients should have in their attorneys, and represents a danger to clients who entrust their future in his hands.

We have disbarred attorneys for violating the Rules respondent violated. For example, we have disbarred attorneys who breached their fiduciary responsibilities in violation of Rule 1.15, in addition to violating other Rules. *See, e.g., Attorney Grievance Comm'n v. Braskey,* 378 Md. 425, 836 A.2d 605 (2003) (attorney failed to maintain settlement proceeds in a trust account, exacted an unreasonable fee, had a conflict of interest, and acted dishonestly); *Attorney Grievance Comm'n v. Smith,* 376 Md. 202, 829 A.2d 567 (2003) (attorney failed to keep client funds in an escrow account, failed to hand over pertinent financial records to Bar Counsel, and acted dishonestly). We have imposed the ultimate sanction of disbarment for dishonest conduct in violation of Rule 8.4(c), especially when accompanied by other Rule violations. *See, e.g., Attorney Grievance Comm'n v. Davis,* 375 Md. 131, 825 A.2d 430 (2003) (attorney acted dishonestly in her representation of clients and during the disciplinary process, failed to act competently and diligently, failed to keep clients reasonably informed, failed to withdraw from representation when required,

filed suit without a good faith basis, and failed to make reasonable efforts to expedite litigation); *Attorney Grievance Comm'n v. Lane,* 367 Md. 633, 790 A.2d 621 (2002) (attorney made repeated material misrepresentations, failed to act competently and diligently, failed to abide by clients' decisions concerning the objectives of representation, failed to keep clients reasonably informed, and failed to provide the terms of a contingency fee agreement in writing).

Respondent Allan J. Culver, Jr., is disbarred from the practice of law in the State of Maryland.

*IT IS SO ORDERED. RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761(B), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST ALLAN J. CULVER, JR.*